David M. McELROY, Plaintiff-Appellee,

v.

BOISE CASCADE CORPORATION, et al., Defendants-Appellants.

Court of Appeals of Tennessee,
Middle Section.

Jan. 28, 1982.
Permission to Appeal Denied by
Supreme Court April 26, 1982.

Steven A. Riley and Leigh W. Davidson, Bass, Berry & Sims, Nashville, for defendants-appellants.

Will T. Cowart, WTC Enterprises Energy Group of Tennessee, pro se.

Paul K. Bramlett and N. Eddie Montgomery, Buck, Baker & Baker, Nashville, for plaintiff-appellee.

## OPINION

CONNER, Judge.

The decisive issue here is whether the proof at trial reflects that the defendant-appellant, Boise Cascade Corporation,[1] a manufacturer of pre-fabricated homes, negligently misrepresented that Will Cowart was a competent homebuilder to the plaintiff-appellee, Dr. David M. McElroy, so as to incur liability.

Dr. McElroy began making serious plans to build a home in early 1976. He first became interested in a Kingsberry home, a pre-fabricated line of houses sold by the defendant, after seeing a Boise Cascade advertisement in the February, 1976, issue of *House Beautiful*. After requesting and receiving more promotional literature, Boise Cascade's sales representative, Ray Feher, met the plaintiff on August 18, 1976, to explain the Kingsberry concept and to show Dr. McElroy his Kingsberry home.

Mr. Feher referred Dr. McElroy to Will Cowart as a potential builder of the home. Mr. Cowart was authorized to construct Kingsberry homes, having successfully completed two at the time of this meeting. Boise Cascade only sold its plans and blue prints to certain independent builders. There was a dispute as to the number of builders that were suggested at this meeting. Dr. McElroy contended that only Mr. Cowart was recommended. Mr. Feher testified that he gave Dr. McElroy the names of at least three builders acceptable to Boise Cascade as this was his normal practice. There is no necessity for us to resolve this dispute in the testimony based upon our resolution of the case.

Thereafter, Dr. McElroy began negotiating solely with Mr. Cowart. In any event after plaintiff's singular meeting with Mr. Feher, communications between Dr. McElroy and Mr. Cowart continued over many months regarding style, options, modifications and price of a Kingsberry unit. One year later in August, 1977, the plaintiff, with the benefit of counsel, entered into a contract for the construction of his home with W.T.C. Enterprises, Inc., the corporation which had been formed by Mr. Cowart. The contract contained no reference to Boise Cascade or Kingsberry Homes. It specified that the structure would be completed at a cost of $60,000.00 within six months.

Construction commenced using defendant's pre-fabricated Kingsberry package with modifications. Prior to completion, defects in Mr. Cowart's work became apparent. The foundation was laid some eight to eleven inches out of square. Sheetrock was installed in the house prior to the roof, only to be ruined by rain and snow. The plumbing had to be redone. The deck was not properly supported, and the kitchen floor was not level. Despite these problems with the quality of Mr. Cowart's labors, Dr. McElroy had no complaints regarding the Boise Cascade pre-fabricated package.

Plaintiff ultimately discharged Mr. Cowart with the home far from finished. He hired one Ross Edlin, also a qualified Kings-

---

1. Hereinafter the parties will be referred to as in the trial court or by their names, as abbreviated.

berry builder, to complete the home. Dr. McElroy claimed that the home ultimately cost $92,630.15 instead of the initial $60,-000.00 contract price.

Dr. McElroy then brought this action against Mr. Cowart for breach of contract. He also sued Boise Cascade on the theory that its agent's recommendation of Mr. Cowart as the builder and the statements contained in its sales literature subjected it to liability for negligent misrepresentation. Joe Ford, a Boise Cascade representative, whose name was on the invoices sent to the plaintiff, was also included as a party defendant. Dr. McElroy later amended his complaint to add a claim against Boise Cascade based upon an agency theory. A default judgment was taken against Mr. Cowart, and the chancellor, dismissed the action against Mr. Ford after a bench trial. The chancellor held that Boise Cascade, through its representatives and literature made negligent misrepresentations to the plaintiff. Damages were awarded against Mr. Cowart in the amount of $44,342.00 and against Boise Cascade for $22,100.00. The agency claims were dismissed.

Boise Cascade appealed, contending that it made no misrepresentation of a past or existing fact sufficient to expose it to liability. We agree. Mr. Cowart filed no appeal.

We are required to review this matter de novo with a presumption of the correctness of the ruling of the chancellor. T.R.A.P. 13(d).

In *Haynes v. Cumberland Builders, Inc.*, 546 S.W.2d 228, 232 (Tenn.App.1976), the court enunciated the necessary elements to establish a cause of action based upon negligent misrepresentation:

> ... One who, in the course of his business, profession, or employment, or during a transaction in which he had a pecuniary interest, supplies *false* information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon such information, *if he fails to exercise reasonable care or competence in obtaining or communicating the information.* (Emphasis supplied.)

*See also Jasper Aviation, Inc. v. McCollum Aviation, Inc.*, 497 S.W.2d 240 (Tenn.1972); *Merriman v. Smith*, 599 S.W.2d 548 (Tenn. App.1979); *Hunt v. Walker*, 483 S.W.2d 732 (Tenn.App.1971).

The misrepresentation must consist of a statement of a material past or present fact. *Haynes v. Cumberland Builders, Inc.*, supra at 232. *See also Cumberland Portland Cement Co. v. Reconstruction Finance Corp.*, 140 F.Supp. 739, 751 (E.D.Tenn.1953), aff'd 232 F.2d 930 (6th Cir. 1956). Thus, statements of opinion or intention are not actionable. *See Fowler v. Happy Goodman Family*, 575 S.W.2d 496 (Tenn.1978); *Hamilton v. Galbraith*, 15 Tenn.App. 158, 166 (1932); *Cumberland Portland Cement Co. v. Reconstruction Finance Corp.*, supra at 751. Likewise, puffing or other sales talk is generally not actionable. *Sunderhaus v. Perel & Lowenstein*, 215 Tenn. 619, 388 S.W.2d 140 (1965). Similarly, conjecture or representations concerning *future* events are not actionable even though they may later prove to be false. *Young v. Cooper*, 30 Tenn.App. 55, 203 S.W.2d 376 (1947). *See Brungard v. Caprice Records, Inc.*, 608 S.W.2d 585, 590 (Tenn.App.1980); *Cf. Springer v. Bank of Douglas*, 82 Ariz. 329, 313 P.2d 399 (1957).

The essence of the chancellor's findings of negligent misrepresentation centered around Boise Cascade's literature regarding 1,200 professional builders and the conversation between Mr. Feher and Dr. McElroy. As to the latter, we can find nothing in the oral statements of Boise Cascade's representatives which amounts to a negligent misrepresentation. Mr. Feher only met with Dr. McElroy on a single occasion some one year before the contract with Mr. Cowart was signed. At that meeting Mr. Feher suggested that the plaintiff tour one of the Kingsberry homes that Mr. Cowart had built and that Mr. Cowart understood the building of Kingsberry homes.

A distillation of Dr. McElroy's extensive testimony reveals that Mr. Feher's referral of Mr. Cowart consisted of a suggestion to

Dr. McElroy that he tour the Kingsberry home being built by Mr. Cowart, an eager, young builder who understood the Kingsberry concept. Even if Mr. Feher's comments could be construed as representations that Mr. Cowart knew precisely how to construct the product and *could* do it flawlessly we are unable to find a negligent misrepresentation therein. There is no proof in this record that Mr. Cowart *couldn't* build Dr. McElroy's home according to plans and specifications. The proof is that he *didn't* do so. This is an enormous difference. Many a contractor has had the requisite skills to timely and correctly complete a project, but for a myriad of reasons did not. Based on the proof before us we find this to be the situation herein. This being the case, unless we are to hold Boise Cascade, the manufacturer, to be an insurer of its licensed erectors we must deny recovery to the plaintiff.

After Dr. McElroy left Mr. Feher's home that evening, Mr. Feher never again saw Dr. McElroy. In August, 1977, more than a year later, Dr. McElroy entered into a contract for the construction of his home with Mr. Cowart's firm. During this twelve-month period Dr. McElroy met with Mr. Cowart on many occasions to discuss the various alternatives regarding construction of his home in minute detail. According to Mr. Cowart's testimony, they met twenty to thirty times before the contract was ultimately executed on August 19, 1977. For a long period the parties met on a weekly basis *before* commencement of construction. Dr. McElroy followed Mr. Feher's suggestion that he tour Mr. Cowart's home, doing so on more than one occasion. There was no complaint regarding the quality of construction of that Kingsberry home or another Kingsberry home which Mr. Cowart built for a relative and which Dr. McElroy also toured during construction. The proof disclosed that Mr. Cowart and Dr. McElroy visited four or five Kingsberry homes constructed by other builders in the Middle Tennessee area. So Dr. McElroy was certainly aware that there were accessible to him other builders of Kingsberry homes before entering into the contract with Mr. Cowart.

During these negotiations, Dr. McElroy made various modifications to the standard Boise Cascade plans for the subject home, known as a Tahoe II. Plans and specifications reflecting the various changes desired by Dr. McElroy were incorporated as a part of the contract, but neither party chose to introduce them into evidence at trial. The contract itself makes no reference to Boise Cascade or Kingsberry homes.

Construction of plaintiff's home was begun in the fall of 1977. The Boise Cascade package was delivered to the job site on November 11 and 14, 1977.

The testimony of Dr. McElroy and Mr. Cowart regarding the progress of the work differed. Dr. McElroy and Mr. Edlin claimed that Mr. Cowart's lack of coordination of subcontractors caused slow and poor quality construction. However, Mr. Cowart testified that construction was extremely difficult because of the multitude of modifications made by Dr. McElroy in the plans and specifications for the home, many of them *after* the contract was signed. He also contended that substantial cost overruns were occasioned by Dr. McElroy's substitution of more expensive materials during the progress of construction. He further contended that a horrendous winter contributed to the failure of the work. Again, in view of our disposition of this case it is not necessary to resolve these factual disputes between the parties.

At the time that Dr. McElroy fired Mr. Cowart, he had paid him approximately $50,000.00, although construction was only 50% complete. Under the terms of the contract, Dr. McElroy was required to pay Mr. Cowart weekly 90% of the value of acceptable work and inventory in place in order to avoid cost overruns. Clearly, the amount paid exceeded Dr. McElroy's contract obligation. Dr. McElroy testified that he "was paying him much more even by the contract than I should have been paying because I wanted the house completed. ... I know ... I was well ahead of any sort of obligation I *had with him.*"

Plaintiff talked in large part in generalities. He testified that Mr. Cowart *"implied* that he had built far more than just four or five homes;" further, that Mr. Cowart *"implied* that he had an area of expertise in building Kingsberry homes." The plaintiff said that "he *thought"* Mr. Feher "was aware of Mr. Cowart's training." Dr. McElroy *"thought* Mr. Feher had seen all these homes that Mr. Cowart had built." Dr. McElroy *"thought"* that "Mr. Feher ... was personally knowledgeable in terms of his reliability" and plaintiff *"felt* that he had some knowledge of the man's training and expertise in building homes." Dr. McElroy *"felt* that ... if I had been referred by [Boise Cascade], that things must be okay." Beyond this, plaintiff's testimony was that his conversations with Mr. Feher *"indicated* that we were going to have a quality home for $60,000.00. ... They [Boise Cascade] weren't going to go out of business."

When asked why he made no independent investigation into Mr. Cowart's credentials, Dr. McElroy replied:

A. ... I *felt* I had been offered a concept that I wanted to build by a representative of Kingsberry. He referred to me the builder that he knew could accomplish what we wanted. And I *felt* proof was again in the home that he was living in. I put a lot of value in the fact that he lived in a home that was a Kingsberry Home. (Emphasis supplied.)

Regarding the fact that the written contract between Dr. McElroy and Mr. Cowart's company never mentioned the name of Boise Cascade or Kingsberry homes, the following interchange transpired between counsel for Boise Cascade and the plaintiff:

Q. Did that concern you at all that the contract you were signing did not mention the corporation with which you thought you were dealing?

A. No. I *assumed* and probably it was a poor assumption, but I *assumed* that when I signed that contract, again, that Mr. Cowart was *somehow* held responsible by this total network that we had bought into.

Q. Did you explore that with him?

A. Well, no, not really. I read over the contract and the contract *seemed* to—it didn't seem to—it does state that, for example, if he did not live up to his *obligations* of the contract that certain things could occur. It *seemed* to be a reasonable contract between two people. It *seemed* to be a reasonable contract in terms of what would occur if he did not live up to it. It did not occur to me that, you know, I was dealing with someone who was not what I thought they were. (Emphasis supplied.)

Finally, the plaintiff stated that Mr. Feher *"implied"* to him that Mr. Cowart would make sure that the house was built correctly.

■ Assuming for purposes of discussion that Mr. Feher did make this prediction and that Dr. McElroy "thought," "felt" and "assumed" all of the various other things above recited would turn out as "indicated," or "implied," by Mr. Feher and/or Mr. Cowart, we do not believe such vague and general statements can be the basis for liability under the theory of negligent misrepresentation. The information must be *"false"* and must consist of a *statement* of material *fact* which necessarily requires reasonable specificity. *Haynes v. Cumberland Builders, Inc., supra.* Further, predictions or other such sales talk regarding the future cannot be the basis on a negligent misrepresentation action. *Brungard v. Caprice Records, Inc., supra.*

■ The trial court suggested that the issue was whether Boise Cascade created a "false impression." The chancellor then noted:

... and I think you can be guilty of making a negligent or false representation through creating *impressions.* I do not think it is required that you actually state facts that aren't true. (Emphasis supplied.)

This statement by the chancellor was no doubt the cornerstone for his holding. It is the foundation for our disagreement with that holding. We believe one might subject

himself to liability for intentionally or fraudulently creating "impressions" designed to mislead. However, to subject one to liability for *negligent* (as opposed to intentional and willful) misrepresentation there must be some "false" statement of a material fact, or conduct tantamount to a false statement. *Haynes v. Cumberland Builders, supra; Brungard v. Caprice Records, Inc., supra; Fowler v. Happy Goodman Family, supra.*

■ Based on this record we are unable to ascertain any basis for a finding of negligent misrepresentation of fact arising out of Dr. McElroy's single conversation with Mr. Feher one year before the construction contract was signed. We believe the proof shows that the specific factual representations made by Boise Cascade's representative were accurate when made. We believe the general implications or indications were too vague to be actionable.

Regarding Mr. Feher's purported representations that Mr. Cowart had training and expertise in building Kingsberry homes, the chancellor held that "Cowart had no special training or expertise." The undisputed evidence reveals that Mr. Cowart had successfully constructed four Kingsberry homes, before he commenced construction on the McElroy home. One of these homes had been completed and another commenced before Mr. Feher referred Dr. McElroy to Mr. Cowart. Mr. Feher met with Mr. Cowart on several occasions to determine his suitability as a Kingsberry builder and to educate him regarding the Kingsberry concept *before* a home package was sold to him. Mr. Feher had insisted that Mr. Cowart employ Boise Cascade's field engineer for his first home to educate Mr. Cowart's crew regarding proper construction techniques. Mr. Cowart also utilized the field engineer for the construction of his second Kingsberry home.

We believe the evidence is clear that Mr. Cowart did have some training, expertise and experience in building Kingsberry homes both at the time of Mr. Feher's referral in August, 1976, and when that referral was allegedly relied upon, one year later, in August, 1977.

Mr. Feher did not recommend Mr. Cowart to a prospective homeowner before he had ever built a home. Mr. Cowart did not ask anyone to believe that he was a competent contractor before he built his first home. He built his first home speculatively and later sold it. Neither Mr. Feher nor Mr. Cowart asked anyone to trust Mr. Cowart's competence when he built his second home. This home Mr. Cowart built for himself. Mr. Feher suggested that Dr. McElroy visit Mr. Cowart's home, which he did. The home finally commenced for Dr. McElroy was Mr. Cowart's fifth Kingsberry home. Mr. Edlin, also a "Kingsberry builder," who ultimately assisted Dr. McElroy in completing his home, had worked on a previous Kingsberry home built by Mr. Cowart. As to construction of this house, Mr. Edlin testified there was "no problem." From our review of this record no facts existed at the time Mr. Feher made his recommendation, nor at the time Dr. McElroy allegedly relied upon it, that would lead a reasonable person, including Dr. McElroy or Mr. Feher, to believe that Mr. Cowart was incompetent, dishonest or not creditworthy, although he was clearly "new" in the business.

The fact that Mr. Cowart did not stay within the cost limitations of his contract or failed to properly supervise or coordinate the construction of Dr. McElroy's house cannot be attributed to Boise Cascade. To do so would be to hold Boise Cascade strictly liable for Mr. Cowart's failure to complete this job—a failure that was likely caused by cost overruns resulting from substantial modifications made by Dr. McElroy after the contract was signed, or by dissolution of Mr. Cowart's marriage and financial problems related to his domestic situation and/or other set-backs in his construction business that occurred in this period, such as inclement weather, the combination of which eventually lead to Mr. Cowart's bankruptcy.

The best of builders have laid foundations which are out of square. It is unfortunate when it happens as it invariably causes nu-

merous construction problems, and the builder must be held responsible for the consequences thereof. But we don't believe this responsibility should extend to the supplier of materials or the recommender of the builder without more proof than is here apparent.

It is obvious from this record that Mr. Cowart began suffering critical economic problems from which he never recovered prior to or during construction of the McElroy home. This court takes judicial notice of the fact that a classic symptom of a builder with financial woes is that the quality and quantity of his work deteriorates. "Corners are cut" with both labor and materials. The troubled constructor is likely to try to "get ahead" of his customers on payment. In many instances when the economic burdens finally strangle his cash flows he is unable to complete the work. From this record it would appear that all of these things happened in the instant case. Had Dr. McElroy not overpaid Mr. Cowart the result might have been different. In all likelihood the problems would have been earlier identified with a less costly solution. In any event we are unable to find these circumstances reasonably foreseeable to Boise Cascade and no basis for liability.

Should the recommending manufacturer, with no other relationship to the builder, than as a seller of a pre-fabricated home product with authorization to construct it, be held to the liability of an insurer? Should this manufacturer be required, in effect, to become a guarantor of the builder's performance when things don't go well on the job for financial or other reasons totally *unrelated* to the quality of the manufacturer's product? We think not. Should a manufacturer be liable for suggesting that a builder use its product when material alterations are made thereto or when the owner doesn't properly supervise payments to the builder for his own protection? Again, we must answer in the negative.

Likewise, in our view Boise Cascade's sales literature and letters to plaintiff do not contain language regarding the inde-

pendent builders to whom its pre-fabricated packages are sold so wrongfully laudatory that it could be interpreted as a misrepresentation, negligent or otherwise. The initial *House Beautiful* advertisement that "introduced" Dr. McElroy to Boise Cascade and the sales brochures contain no such commendatory language. However, the letter that Boise Cascade sent to the plaintiff in reply to his inquiry about Kingsberry homes said:

> ... Kingsberry Homes are distributed through more than 1,200 *independent professional home builders* in a 38 state area.... (Emphasis supplied.)

As we read the chancellor's opinion, this sentence from the Boise Cascade cover letter to Dr. McElroy was the particular portion of this defendant's literature found to contain a misrepresentation. The court quoted from the *American Heritage Dictionary of the English Language* the following definition of "professional" as used in the letter: "having skill or experience in a particular field or activity." It seems to us the chancellor could have used another definition of the word from the same dictionary which would have been equally appropriate in the context of the Boise Cascade message: [one who is] "engaged in a specific activity as a source of livelihood." In any event, taking the definition of the word "professional" as used by the chancellor we are still unable to find any actionable misrepresentation.

Using the trial court's definition of the word, the adjective "professional" used to describe the independent home builders who construct Kingsberry homes could be deemed a representation regarding the competency of the builders. However, the uncontroverted evidence in this record established that Mr. Cowart did indeed have some skill and experience in a particular field of activity (building Kingsberry homes). He had successfully built two at the time the letter was written and completed two more prior to the contract execution on Dr. McElroy's house. This representation by Boise Cascade as it relates to Mr. Cowart was certainly true in a technical

sense at the time it was made and at the time it was allegedly relied upon by Dr. McElroy. Mr. Cowart was, in fact, a professional home builder by trade under the trial court's definition and this record suggests no facts apparent or that should have been apparent to Boise Cascade to the contrary at these critical times.

On the subject of "professionals," this court has seen many people who styled themselves as such, who were then and are now without any particular expertise in a given area. Examples which come to mind are so-called professional golfers who shoot 90 and purported professional tennis players who can't break a window pane with their serve. By the same token we have observed "professionals" in these same areas endowed with the highest skills miss two-foot putts or double fault to lose major championships. The point is that use of the word "professional" is, in and of itself, no guarantee of anything. Professionals make mistakes every day whether in the stock market or construction industry, and whether their expertise is great or small.

The word "professional" standing alone should not make any person who might rely on the skills of such purported "professional" take like pablum anything he or she says or does, so as to attach liability to a third party when things don't go as planned. Common sense suggests an independent and reasonable check of qualifications, credentials and performance of whatever task this "professional" undertakes. We suggest that as a reasonable rule of thumb, the more significant the transaction undertaken with a "professional," the more careful should be the examination.

The chancellor further held that a reference to "more than 1,200" independent builders was misleading because "[t]here is no limit to the number of builders who build Kingsberry homes as the letter suggests." Obviously, the number of approved Kingsberry builders will fluctuate periodically as new builders are approved or old builders disapproved, and the statement may or may not have been precisely correct at the time it was made. However, we are unable to see the relevance to the questions here presented. The only "approved builder" Dr. McElroy looked to or relied upon, was Mr. Cowart. This is so whether this occurred through his own observations, Boise Cascade's suggestions or a combination thereof. Further, in our view, the meaning of the word "independent" is overlooked in the analysis. It is defined by *Webster's New Collegiate Dictionary* (1974), as: "1. not dependent: as a (1): not subject to control by others: SELF–GOVERNING (2): not affiliated with a larger controlling unit. . . ." There are other equally descriptive definitions of the word to suggest to any reasonable reader that these "independent builders" were not the agents, employees or servants of Boise Cascade.

The chancellor found that: "[i]n truth, there is no such thing as a 'Kingsberry builder,'" and bolsters this conclusion by noting that: "[i]n fact, a person with absolutely no experience or training in home building can become a 'Kingsberry builder(s).'" No doubt, it is possible for a person with no prior experience to become a Kingsberry builder. However, we do not believe that this fact necessarily leads to the conclusion that there is no such thing as a Kingsberry builder. If an inexperienced builder is determined by a Boise Cascade sales representative to be "capable of becoming a competent builder," if the potential builder receives a satisfactory credit report, if the builder agrees not to misuse Boise Cascade's plans and blueprints and if he agrees to employ Boise Cascade's field engineer to assist him to construct at least his first home, as we understand this record he *may* then become a Kingsberry builder. This record does not disclose that just because an individual has credit, without more, that Boise Cascade will allow him to become an authorized Kingsberry builder. The proof is to the contrary: Mr. Feher, who the chancellor noted was a very candid witness testified in this regard:

Q. What does competence as a builder have to do in relation to being approved as a Kingsberry builder or dealer?

A. Well, you know, we had to decide as salespeople whether we thought he was competent as a builder, or if we thought he could become competent as a builder. And these were decisions that I had to make as a salesman in this particular area. And it's a judgment situation, and that's what they were paying me for, to make the proper decisions as to who I recruited as builders that would do it competently for us in that particular area.... But, to me performance after I enter in a business agreement with somebody is much more important to me than what he has done in the past. And if he can perform for me, yes, I would be concerned, and I would watch, and I did watch all people that I did business with very carefully and see if they performed for me as they indicated they would. And Mr. Cowart did do what I expected of him in the period of time that I dealt with him as a salesman.

The chancellor determined that Dr. McElroy "reasonably assumed that Will Cowart was a competent builder and one who had special training and expertise in building Kingsberry homes." Was it reasonable for Boise Cascade to make this same assumption under the facts of this case? We believe so.

Even if it can be assumed for the sake of argument that Boise Cascade might be found to have made a negligent misrepresentation herein, in our view this defendant would have yet another absolute defense.

■ A cause of action based on negligent misrepresentation is one sounding in tort. As such, it is subject to all usual defenses of a negligence action, including contributory negligence. *Isaacs v. Bokor*, 566 S.W.2d 532 (Tenn.1978); *Tartera v. Palumbo*, 224 Tenn. 262, 453 S.W.2d 780 (1970). Under Tennessee law contributory negligence is ordinarily a complete bar to a plaintiff's recovery. *Hood v. Waldrum*, 58 Tenn.App. 512, 434 S.W.2d 94 (1968). This principle is adopted in the *Restatement (Second) of Torts* § 552A (1977):

> The recipient of a negligent misrepresentation is barred from recovery for pe-

cuniary loss suffered in reliance upon it if he is negligent in so relying.

Comment a to Section 552A mandates that the recipient of a negligent misrepresentation is held to the standard of care, knowledge, intelligence and judgment of a reasonable man in relying on the misrepresentation.

■ Assuming *arguendo* that Boise Cascade was indeed negligent in its investigation of Mr. Cowart and its ultimate representations, then in our view, Dr. McElroy was contributorily negligent in relying on those representations. He investigated Mr. Cowart, as did Boise Cascade. He visited the homes Mr. Cowart had built. He talked with other builders, observed him on a first-hand basis and negotiated with him on and off for a year. He poured over plans and specifications with Mr. Cowart. If Boise Cascade should have discovered that Mr. Cowart was an incompetent builder, then Dr. McElroy should have discovered this as well. In fact, he should have ascertained it more readily as he had far greater contact with Mr. Cowart than did any representative of Boise Cascade.

Dr. McElroy negotiated with Mr. Cowart for nine to ten months before he executed a contract with him. Both parties were represented by counsel. Mr. Cowart testified that the two parties met twenty to thirty times before the contract was executed. Dr. McElroy inspected at least two homes built by Mr. Cowart. Over a year passed between Mr. Feher's referral and the execution of the contract. Dr. McElroy had talked with several other builders.

The chancellor in his memorandum recognized that an independent investigation has been undertaken by Dr. McElroy. The trial judge described most of the factors listed herein as "a number of significant facts which point to a break in the causation chain between [Boise Cascade's] misrepresentation in 1976 and the plaintiff's loss in 1978." Because of these "significant facts," the chancellor held that Dr. McElroy should share his loss equally with Boise Cascade, awarding plaintiff a verdict against Boise

Cascade approximately one-half the size of that rendered against Mr. Cowart.

Implicit in this differing award of damages is a finding by the chancellor that Dr. McElroy was indeed contributorily negligent. This negligence could not be considered as "remote" by any reasonable characterization of the conduct of Dr. McElroy compared with that of Boise Cascade. Of course, Tennessee does not now recognize the doctrine of comparative negligence. *Walters v. Glidwell*, 572 S.W.2d 657, 659 (Tenn.App.1978).

In the last analysis we do not believe the requirements of the law have yet reached the state where a manufacturer will subject itself to liability for its agent's one-time well-meant suggestion of a possible person or firm to install its product one year before construction begins. This is especially so when there has been minimal contact between the manufacturer and the aggrieved consumer, but substantial contact between that consumer and the builder. We do not believe that Boise Cascade or any other manufacturer is the insurer of the applicator under our law.

Or stated differently, we do not believe a manufacturer can be held strictly liable for a business referral, made in good faith, when there is later an unanticipated failure of performance by the suggested firm, absent the communication of false information. *See Haynes v. Cumberland Builders, Inc., supra.*

Boise Cascade has raised other assignments of error relating to deficiencies in plaintiff's proof regarding damages and we are sympathetic to these contentions. However, in view of our disposition of this case on the fault issue there is no need to address these questions.

Accordingly, this cause is reversed and dismissed as to the defendant, Boise Cascade. It is remanded for collection of costs, which are assessed against the plaintiff.

REVERSED, DISMISSED AND REMANDED.

TODD, P. J., and CANTRELL, J., concur.