IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
August 26, 2010 Session

REGIONS BANK, SUCCESSOR-IN-INTEREST TO UNION PLANTERS
BANK v. LOST COVE CABINS AND CAMPGROUNDS, INC. ET AL.

Appeal from the Chancery Court for Van Buren County
No. 1199      Larry B. Stanley, Jr., Judge

No. M2009-02389-COA-R3-CV - Filed November 9, 2010

The trial court entered judgment against the borrowers and guarantors on two promissory
notes. On appeal, the defendants argue that the trial court erred in striking their jury demand
and that they are entitled to relief under an alleged written commitment for permanent
financing or under various equitable theories. We find the defendants' arguments to be
without merit and affirm the decision of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed**

ANDY D. BENNETT, J., delivered the opinion of the Court, in which PATRICIA J. COTTRELL,
P.J., M.S., and RICHARD H. DINKINS, J., joined.

Granville Sumner R. Bouldin, Jr., Murfreesboro, Tennessee, for the appellants, Lost Cove
Cabins and Campgrounds, Inc., J. Darin Lance, and JDL Properties, Inc.

Joseph Robert Prochaska, Nashville, Tennessee, for the appellee, Regions Bank, Successor-
in-Interest to Union Planters Bank.

OPINION

FACTUAL AND PROCEDURAL BACKGROUND

J. Darin Lance was the president and sole shareholder of JDL Properties, Inc. ("JDL").
Winding Creek, L.P., was a limited partnership, and JDL served as the general partner of
Winding Creek. Winding Creek purchased a large tract of property located along Highway
111 in Spencer, Tennessee, with the intent of building a mixed use development, including
a campground and cabin rental facility known as Lost Cove.

In early 2000, Lance approached Larry Brown, senior loan officer at Union Planters Bank ("UP"), concerning financing for the Lost Cove project. Early in the process, Lance and Brown discussed seeking the participation of the Small Business Administration ("SBA") in the form of a Section 504 loan. The plan was for UP to make two interim loans to finance construction of Lost Cove. The smaller loan would be paid off through a Section 504 loan, and the larger loan would be refinanced by UP into a permanent loan. Lance, with the assistance of attorney George Burke, worked on gathering the information necessary to apply for a Section 504 loan through the Southeast Local Development Corporation ("SLDC"), the SBA's agent.

On March 5, 2001, Brown sent a letter to David Jones at the SLDC stating, in pertinent part:

> Union Planters Bank has committed to loan Winding Creek $867,000.00 which includes our permanent loan of $519,000.00 and the SBA's loan of $345,000.00. The development will contain RV space, cabins and a campground.
>
> Our commitment is contingent upon SBA making the 504 loan in the amount of $348,000.00. Due to other commitments to Winding Creek and the size of this loan, we will be unable to provide financing without SBA's participation.

At UP's request, Winding Creek organized a separate entity, Lost Cove Cabins and Campgrounds, Inc., to be the owner and borrower for the Lost Cove project. On March 9, 2001, the SBA issued an authorization for debenture guarantee, a thirteen-page document detailing the project financing and including pages of conditions. In a UP credit memo dated March 22, 2001, Brown described the basic outlines of the proposed loan arrangements.

On April 9, 2001, the parties executed the actual loan documents. Lost Cove executed two promissory notes, one for $349,466.90 and one for $519,663.55, with a maturity date of October 9, 2001. Lance and JDL each executed a guaranty; Lost Cove granted UP two deeds of trusts secured by the property to be developed into the campground; and Lost Cove and UP entered into two business loan agreements.

Unfortunately, construction of the Lost Cove campground did not proceed as planned. The following stipulated facts tell the story:

> Lost Cove originally planned for the campground to have 20 rental cabins, along with some campsites and RV parking sites. However, the project was plagued by cost overruns and delays, caused in part by the water treatment

problems in Spencer, Tennessee and in part by increased costs of grading and cabin construction. The construction was originally scheduled to be completed by October 2001, however, Lost Cove did not declare construction complete until on or before November 14, 2002. At the time Lost Cove declared its construction complete, the campground had only 10 rental cabins, instead of the 20 planned. The cost to "complete" the campground was $1,334,577.82, instead of $957,000.

Lost Cove projected its gross revenues to be $179,850 for 2001, but realized none; projected revenues for 2002 to be $488,125.00 but realized $26,583.07. Lost Cove's gross revenues for 2003 and 2004 were $67,670.58 and $20,429.00, respectively. Lost Cove lost $20,123 in 2001, lost $32,885.41 in 2002, lost $115,650.68 in 2003, and lost $92,915.00 in 2004.

UP extended the maturity dates on the promissory notes until April 2002 and then until April 2003. The original SBA authorization for debenture guarantee expired in March 2002, and the SBA extended the expiration date twice.

On November 14, 2002, Burke wrote a letter to Elizabeth Howard at SLDC outlining the revised project costs and requesting an increase in the Section 504 loan to $460,000.00. Burke stated, "It is our understanding that Union Planters Bank is prepared to increase its Third Party Lender Loan to 45% of project cost in keeping with its former commitment." Howard sent a request to the SBA in March 2003, certifying that there had been no adverse changes noted with respect to Lost Cove's financial information. In April 2003, the SBA approved the increased loan amount and amended its loan authorization accordingly.

There is no dispute that it was the responsibility of Lost Cove to submit its application and the required documentation for the Section 504 loan to the SLDC. The parties also stipulated that Lost Cove never provided SLDC with a number of required documents, including a title insurance commitment, guarantees of the loan, an environmental review, verified financial information, proof of the working capital, proof of compliance with building standards, and the final inspection report or certificate of occupancy for the project. The Section 504 loan never closed.

Brown, Lance's main contact at UP, left the bank in October 2002. Although Lost Cove had been making interest-only payments on its loans, it made no payments after March 19, 2003. The promissory notes matured in April 2003. The bank called the loans and sold the Lost Cove property at a foreclosure sale in August 2004. The campground sold for $316,000.00.

Lawsuit

Regions Bank, successor in interest to UP, instituted this action in September 2004 against Lost Cove, Lance, and JDL to collect the deficiency due on the promissory notes, $680,685.47. The defendants counterclaimed, asserting causes of action for intentional and/or negligent misrepresentation, breach of contract, promissory estoppel, and equitable estoppel. The parties engaged in extensive discovery.

In September 2007, Regions moved for summary judgment; and the court denied the motion on the basis that material facts were in dispute. Regions moved to strike the defendants' jury demand on the ground that the defendants had waived the right to a jury trial in the loan documents. The court granted the motion to strike in February 2009 and set the case for trial.[1]

The case was tried in September 2009, and the court heard testimony from the following witnesses: Darin Lance; Albert Dicus, a CPA who did work for JDL, Winding Creek, and Lost Cove; Larry Brown, former UP banker; David Clinton Wood, a CPA who testified as an expert on behalf of Regions; George Burke, the attorney who helped Lance with the Section 504 loan process; and Elizabeth Howard, the SLDC employee in charge of Lost Cove's Section 504 loan. The court entered judgment in favor of Regions.

On appeal, Lost Cove and its guarantors, Lance and JDL, raise the following issues: (1) whether the trial court erred in striking the defendants' jury demand; (2) whether the loan commitment letter, credit memo, and credit proposal constitute an enforceable written commitment to lend funds; and (3) whether Lost Cove reasonably relied upon the bank's promise to lend the necessary funds, thereby estopping the bank from denying the commitment.

STANDARD OF REVIEW

We review questions of law de novo with no presumption of correctness. *Nelson v. Wal-Mart Stores, Inc.,* 8 S.W.3d 625, 628 (Tenn. 1999). The trial court's findings of fact are reviewed de novo with a presumption of correctness unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d); *Union Carbide Corp. v. Huddleston*, 854 S.W.2d 87, 91 (Tenn. 1993). We "give great weight to the trial court's assessment of the evidence because the trial court is in a much better position to evaluate the credibility of the witnesses." *Boyer v. Heimermann,* 238 S.W.3d 249, 255 (Tenn. Ct. App. 2007).

---

[1]Although the trial court granted the defendants' request for permission to seek an interlocutory appeal, this court denied the application.

ANALYSIS

1.

In their answer and counterclaim, both as originally filed and as amended, the defendants included a demand for trial by a jury. The defendants argue that the trial court erred in striking their jury demand.

The issue here is whether the jury waiver provisions included in the loan documents are enforceable. The promissory notes signed by Lance on behalf of Lost Cove contain the following provision: "JURY WAIVER. Lender and Borrower hereby waive the right to any jury trial in any action, proceeding, or counterclaim brought by either Lender or Borrower against the other." This provision appears on the first page of the promissory notes, which are one and a half pages in length. The promissory notes also contain an acknowledgment provision stating, in all capital letters: "PRIOR TO SIGNING THIS NOTE, BORROWER READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS NOTE. BORROWER AGREES TO THE TERMS OF THE NOTE."[2]

The business loan agreements between UP and Lost Cove include a similar jury waiver provision and acknowledgment provision. These documents were signed by Lance on behalf of Lost Cove. Lance also signed two commercial guarantees, one on behalf of himself and the other on behalf of JDL. These two-and-a-half-page documents include a jury waiver provision and an acknowledgment provision.[3]

In order to be enforceable, a jury waiver must be "knowing, voluntary, and intelligent." *Poole v. Union Planters Bank, N.A.*, No. W2009-01507-COA-R3-CV, 2010 WL 1404416, at *7 (Tenn. Ct. App. Apr. 8, 2010) (perm. app. denied Sept. 23, 2010). The defendants argue that the bank had the burden of proving that the jury waiver was knowing and voluntary and that there was no proof before the court on this issue. We find the recent case of *Poole v. Union Planters Bank* to be on point and dispositive of these issues. *Id.* at *3. In *Poole*, the court concluded that pre-dispute contractual waiver of the right to trial by jury in a civil case is not prohibited in Tennessee.[4] *Id.* Once this issue was decided, the court

_____

[2]It appears from the copies of the promissory notes in the record that the jury waiver provisions and the acknowledgment provisions are written in bold type.

[3]From the copies of the guarantees and the business loan agreements in the record, the jury waiver and acknowledgment provisions appear to be written in bold type.

[4]The court in *Poole* noted the distinction between pre-dispute arbitration agreements, which are
(continued...)

proceeded to evaluate the enforceability of the particular jury waiver provisions found in the three contracts between Mr. Poole and the bank. *Id.* at *7-9. The court in *Poole* identified the following non-exhaustive list of factors to apply when examining a jury-waiver provision:

> (1) the conspicuousness of the jury-waiver provision; (2) the parties' business acumen and experience; (3) the representation, or lack thereof, of counsel; (4) the negotiations had concerning the agreement and the waiver provision; (5) the relative bargaining power of the parties; (6) the nature of the contract; and (7) the existence of fraud, overreaching, or unconscionability.

*Id.* at *8.

Declining to determine which party should bear the burden of proof, the *Poole* court concluded that, even if the bank had the burden of proof, the evidence was sufficient to permit enforcement of the jury waiver at issue. *Id.* The evidence in *Poole* consisted mainly of the three contracts themselves, and the court noted that one of the contracts (the security agreement) was only two pages long. *Id.* The court found that the jury waiver provision in the security agreement, which appeared on the second page, was not highly conspicuous in that it was in the same font as the rest of the agreement, was not underlined, fell within a larger paragraph, and did not have a separate signature line. *Id.* at *9. The court also found, however, that the provision was "fairly straightforward and easy to understand." *Id.* In addition, the contract included a capitalized and bolded acknowledgment provision stating that the signer had read and understood all of the provisions of the agreement. *Id.* The court also assigned significance to the fact that Mr. Poole had signed three separate documents containing a similar jury waiver provision and a capitalized, bolded acknowledgment provision. *Id.* The promissory note, like the security agreement, was only two pages long; and the court found the "relative brevity of two of the agreements" to be significant. *Id.* Stating that "[i]t is axiomatic that a party who signs a contract is presumed to know its contents," the court found "sufficient reason to impute knowledge of the jury-waiver provisions at issue to Mr. Poole," and noted that Mr. Poole had not disputed this point. *Id.*

The court in *Poole* relied on the bank's presentation of "three separate agreements demonstrating three separate knowledgeable decisions to waive the right to trial by jury" and cited the lack of countervailing evidence or arguments. *Id.* There were no allegations of fraud, unconscionability, or overreaching. *Id.* Although Mr. Poole asserted that there was

---

[4](...continued)
expressly authorized by statute, and pre-dispute contractual jury waivers. *Id.* at *3, n.4. Although the loan documents in the present case contain provisions allowing either party to request resolution of disputes by arbitration, those provisions were not invoked by either party.

a "gross disparity in bargaining power" between the parties, that he had no opportunity to obtain counsel, and that there was no opportunity to negotiate terms, there was no evidence in the record to support these assertions. *Id.* The court concluded as follows:

> Even if the Bank had the initial burden to demonstrate the enforceability of the jury-waiver provisions, we find that the presentation of three separate contracts containing jury-waiver provisions, two of which are only two pages in length, carried that burden. Because Mr. Poole has presented no evidence in rebuttal, we hold that the trial court correctly decided the Bank's motion to strike his jury demand.

*Id.*

Similarly, in the present case, Lance signed three separate contracts, one of which was less than two full pages long and another of which was less than three full pages long, all three of which contained a prominent acknowledgment provision. As in *Poole*, the contracts themselves are sufficient to uphold the enforceability of Lance's waiver of trial by jury since he did not present any countervailing evidence. Moreover, unlike Mr. Poole, a truck driver, Lance was an experienced businessman and licensed real estate broker with over 20 years of experience in real estate development.[5]

The defendants' final argument on the jury waiver issue is that the bank waived its right to enforce the jury waiver provisions "by failing to timely object to the demand and allowing the matter to be set for a jury trial on more than one occasion." In support of this argument, the defendants emphasize that the bank did not object to their jury demand until December 2008 when the bank filed a motion to strike, whereas the jury demand appeared in their original answer and counterclaim filed in November 2004 and in subsequent amended pleadings. The defendants also point out that the case was set on a jury docket for some period of time.

---

[5]Both parties filed briefs on the motion to strike in the trial court. The bank filed a reply brief with excerpts from Lance's deposition in which he testified that he probably had not read the loan documents before signing them and that he assumed that he had to agree with the terms of the loan documents in order to get the loans. The defendants assert that they never had the opportunity to respond to the plaintiff's reply brief because it was not filed until the day of the motion hearing. We do not consider Lance's deposition testimony significant since the law presumes that a party who signs a contract knows its contents. *See Beasley v. Metro. Life Ins. Co.*, 229 S.W.2d 146, 148 (Tenn. 1950); *Philpot v. Tenn. Health Mgmt., Inc.*, 279 S.W.3d 573, 581 (Tenn. Ct. App. 2007). Moreover, there is nothing in the record to indicate that the defendants requested a continuance to allow them to respond to the bank's reply brief.

Under Tennessee law, "[t]here can be no waiver where there is no intent to waive, unless a party so acts as to mislead the other, and is estopped thereby." *Faught v. Estate of Faught*, 730 S.W.2d 323, 326 (Tenn. 1987). For an effective waiver, "there must be clear, unequivocal and decisive acts of the party or an act which shows determination not to have the benefit intended." *Gitter v. Tenn. Farmers Mut. Ins. Co.*, 450 S.W.2d 780, 784 (Tenn. Ct. App. 1969). We consider the court's analysis in *Poole* instructive regarding the defendants' "waiver of the waiver" argument in the present case. In *Poole*, the court addressed Mr. Poole's argument that the bank had waived its right to enforce the jury waiver provisions by delaying its motion to strike (which was filed almost four years after the commencement of the lawsuit) and by entering into a scheduling order. *Poole*, 2010 WL 1404416, at *7. In rejecting Mr. Poole's argument, the court reasoned:

> The better rule, however, permits a party seeking to strike a jury demand to file a motion up to the "eve of trial" to enforce the parties' contract. Under such circumstances, the mere entry of a scheduling order coupled with permissible delay is insufficient to demonstrate waiver of the right to enforce a contractual jury-waiver provision. . . . [I]t is the opinion of this Court that the entry of a scheduling order does not manifest an intent and purpose to waive a jury-waiver provision where, as here, a party may move to strike a jury demand up to the eve of trial.

*Id.* (citations omitted). We likewise conclude in this case that the bank did not evidence an intent to waive its right to enforce the contractual jury waiver provisions. Therefore, the trial court did not err in denying the motion to strike.

2.

Under the Tennessee Statute of Frauds, a promise or commitment to lend money must be in writing to be enforceable. Tenn. Code Ann. § 29-2-101(b). The defendants argue that the bank's March 2001 loan commitment letter, credit memo, credit proposal, and the SBA documents constitute an enforceable written commitment to provide permanent financing for the Lost Cove project, thereby satisfying the statute of frauds. We disagree.

There are a number of problems with the defendants' argument. We are not convinced that the terms of these documents are sufficiently definite to make out an enforceable agreement to provide permanent financing.[6] Rather, the March 2001 letter, credit memo, and credit proposal summarize the bank's intentions with regard to future agreements with Lost

---

[6]The bank was not a party to the SBA documents, which contain numerous conditions, so these documents cannot create an obligation on the part of the bank to provide permanent financing.

Cove. Moreover, even if a written commitment to provide permanent financing did exist, the bank did not breach its contract because Lost Cove never satisfied its obligations. As the trial court specifically found, the bank's commitment as expressed in the March 2001 letter relied upon by the defendants "was contingent upon the SBA making its 504 Loan, the Bank being in first position, and guaranty agreements being given by the partners." The credit memo specifically provides that "the bank will participate with SBA on a 504 program where the bank will loan $519,000 and have a first lien on the property and improvements." The memo also states that the campground would have 20 rental cabins, whereas only 10 cabins were built. It is undisputed that the defendants were responsible for the SBA loan application process, which they never completed, and that the Section 504 loan never closed. The parties further stipulated that the SBA never approved a closing on Lost Cove's Section 504 loan and that, "[i]f SLDC refused to go forward with the Section 504 Loan, Regions Bank had no obligation to go forward with any additional funding to Lost Cove."

Under the terms of the interim loan agreements executed in April 2001, Lost Cove was in default and the bank had the right to call the loans. The bank had no contractual obligation to provide permanent financing on a project that was in default on the interim loans.

3.

The defendants rely on several equitable theories to establish an exception to the statute of frauds: equitable estoppel, and intentional or negligent misrepresentation.[7] These arguments, too, must fail.

The elements of equitable estoppel are:

(1) Conduct which amounts to a false representation or concealment of material facts, or, at least, which is calculated to convey the impression that the facts are otherwise than, and inconsistent with, those which the party subsequently attempts to assert;

(2) Intention, or at least expectation that such conduct shall be acted upon by the other party;

(3) Knowledge, actual or constructive of the real facts.

---

[7]The defendants also assert promissory estoppel, but this doctrine has not been recognized as an exception to the statute of frauds. *Seramur v. Life Care Ctrs. of Am., Inc.*, No. E2008-01364-COA-R3-CV, 2009 WL 890885, at *5 (Tenn. Ct. App. Apr. 2, 2009); *Nationsbank, N.A. (S.) v. Millington Homes Investors, Ltd.*, No. 02A01-9805-CH-00134, 1999 WL 79204, at *3-4 (Tenn. Ct. App. Feb. 19, 1999).

*Osborne v. Mountain Life Ins. Co.*, 130 S.W.3d 769, 774 (Tenn. 2004); *see also Nationsbank, N.A. (S.) v. Millington Homes Investors, Ltd.*, No. 02A01-9805-CH-00134, 1999 WL 79204, at *4 (Tenn. Ct. App. Feb. 19, 1999). Negligent misrepresentation requires a plaintiff to prove the following elements:

(1) the defendant is acting in the course of his business, profession or employment, or in a transaction in which he has a pecuniary (as opposed to gratuitous) interest; *and*

(2) the defendant supplies faulty information meant to guide others in their business transaction; *and*

(3) the defendant fails to exercise reasonable care in obtaining or communicating the information; *and*

(4) the plaintiff justifiably relies upon the information.

*Ritter v. Custom Chemicides, Inc.*, 912 S.W.2d 128, 130 (Tenn. 1995). The false information supplied must "consist of a statement of a material past or present fact." *McElroy v. Boise Cascade Corp.*, 632 S.W.2d 127, 130 (Tenn. Ct. App. 1982); *see also Cummins v. Opryland Prods.*, No. M1998-00934-COA-R3-CV, 2001 WL 219696, at *8 (Tenn. Ct. App. Mar. 7, 2001). Statements of intention or representations concerning future events cannot form the basis for a claim of negligent misrepresentation. *Naifeh v. Valley Forge Life Ins. Co.*, No. W2003-02800-COA-R3-CV, 2005 WL 1073647, at *8-9 (Tenn. Ct. App. May 5, 2005); *Gardner v. Anesthesia & Pain Consultants, P.C.*, No. E2003–03027-COA-R3-CV, 2004 WL 2715304, at *6 (Tenn. Ct. App. Nov. 30, 2004); *McElroy*, 632 S.W.2d at 130. With intentional misrepresentation, it must be established that the defendant made a misrepresentation with knowledge of its falsity or without regard to its truth or falsity. *Shahrdar v. Global Hous., Inc.*, 983 S.W.2d 230, 237 (Tenn. Ct. App. 1998).

The trial court in this case made the following relevant factual findings regarding the proof:

-[Attorney Burke] did not testify that the Bank made any intentional or negligent misrepresentations of any facts or that Lost Cove relied on any promises made by the Bank.

-At no time did Mr. Brown testify that he made an oral promise or representation that the Bank would lend additional funds to Lost Cove, or that

he or anyone at the Bank had made any misrepresentations, negligent or otherwise, to the Defendants.

The trial court heard all of the testimony and found no credible evidence of any misrepresentations by the bank. Addressing the claims for negligent or intentional misrepresentation, the court concluded that "[t]here were no misrepresentations made by the Bank to the Defendants," and that "there was no false statement upon which Lost Cove relied to its detriment." The evidence does not preponderate against the court's findings.

Given the trial court's findings, we conclude that the court properly dismissed the defendants' equitable defenses.

CONCLUSION

We affirm the trial court's judgment in all respect. Costs of appeal are assessed against the appellants, for which execution may issue if necessary.

_____
ANDY D. BENNETT, JUDGE