**B.F. HIRSCH, Appellee,**

v.

**ENRIGHT REFINING COMPANY, INC., Appellant.**

No. 84–5087.

United States Court of Appeals, Third Circuit.

Argued Sept. 14, 1984.

Decided Dec. 31, 1984.

John L. McGoldrick (argued), John F. Brenner, McCarter & English, Newark, N.J., for appellant.

David M. Brodsky, Robert M. Abrahams (argued), Aegis J. Frumento, Schulte, Roth & Zabel, New York City, Ronald M. Sturtz, Lawrence T. Neher, Hannoch, Weisman, Stern, Besser, Berkowitz & Kinney, P.A., Newark, N.J., for appellee.

Before SEITZ, and BECKER, Circuit Judges, and TEITELBAUM, District Judge.[*]

## OPINION OF THE COURT

SEITZ, Circuit Judge.

The defendant, Enright Refining Company, Inc., appeals from a judgment entered after a bench trial. The district court found that the defendant was liable for breach of contract, fraud, and civil violation of title IX of the Organized Crime Control Act, Racketeer Influenced and Corrupt Or- ganizations (RICO), 18 U.S.C. § 1961–1968 (1983). This court has jurisdiction under 28 U.S.C. § 1291 (1983).

## I. BACKGROUND

"Gold! Gold! Gold! Gold!
Bright and yellow, hard and cold."
Thomas Hood, Miss Kilmansegg and Her Precious Leg. Her Moral.

The plaintiff, B.F. Hirsch, is a jewelry manufacturing firm in New York City specializing in the production of gold rings. As a by-product of its manufacturing process, the plaintiff produces scrap gold. This scrap gold, usually in the form of 10 and 14 karat gold, is accumulated and periodically sent to a refiner to be melted down and refined into fine gold of at least 99.95% purity. The refiner returns either an agreed amount of the fine gold or pays cash for the metals.

Gold refiners generally use one or both of two forms of payment for their services. First, there are often refining and handling fees based on the weight of the refined metal and whether gold or cash is to be returned. Second, some refiners account for less than 100% of the precious metal that is sent to them. This second charge is defined in terms of an "accountability" or "retainage." Thus, a refiner with a 98% accountability would have a 2% retainage and would return or pay for 98% of the assayed amount of gold in the material shipped to the refiner.

Between 1973 and September 1976, the plaintiff sent 47 shipments of scrap gold to the defendant's predecessor, the Enright Refining Company, a New Jersey refiner. The district court found that during this period, the Enright Refining Company maintained a 100% accountability and charged only refining and handling fees.

In September 1976, the assets of the Enright Refining Company were sold to an unrelated corporation, the Enright Refining Company, Inc., the defendant in this action. The new company, although under differ-

---

[*] The Honorable Hubert I. Teitelbaum, Chief Judge of the United States District Court for the Western District of Pennsylvania, sitting by designation.

ent ownership, continued operation with basically the same personnel and facilities.

Between October 1976 and December 1977, the plaintiff sent 21 shipments to the defendant. The defendant, without disclosing that it had what the district court found was a new policy, began charging a 0.5% retainage for gold and a 1.5% retainage for silver. The parties stipulated that the value of the gold and silver not returned to the plaintiff during this period was $12,196.19. At the conclusion of each transaction, the defendant would send a report letter stating the contents of the gold shipment and sometimes the assay results. Both the contents and the assay figures were calculated after deducting the retainage, although there was no indication that any retainage was being assessed.

From December 1977 to October 1980, the plaintiff did not employ the services of the defendant, but sent their scraps to a competing refiner. In October and November of 1980, the plaintiff sent two large shipments to the defendant. The defendant, in addition to the refining and handling fees, and without disclosure to the plaintiff, assessed a 2% retainage for gold and a 5% retainage for silver. The value of the gold and silver not returned in these two shipments was stipulated to be $98,979.65.

The plaintiff became suspicious when the return of gold in the second shipment was much lower than expected. When confronted, the defendant disclosed its retainage policy, but refused to return the value of the retained metals. This action then ensued.

After a bench trial on the issues, the district court, applying New Jersey law,[1] found that the defendant breached its oral contract with the plaintiff when it assessed a retainage fee. Further, the district court found that the defendant had committed fraud because it intentionally misled the plaintiff and deliberately concealed the retainage through false and misleading report letters. Finally, the district court

found that the defendant's fraudulent conduct violated 18 U.S.C. § 1962(c), a provision of RICO, and that the defendant was liable for treble damages and attorney's fees under that statute. *B.F. Hirsch, Inc. v. Enright Refining Co., Inc.*, 577 F.Supp. 339 (D.N.J.1983). This appeal followed.

## II. BREACH OF CONTRACT

■ The district court found that the terms of the oral contract between the plaintiff and the defendant provided for 100% accountability. It found this was true, even though the parties never discussed accountability, for two reasons: (1) as for the transactions between October 1976 and the end of 1977, the terms of the prior contract between the defendant's predecessor and the plaintiff continued as an implied term in the subsequent contracts with the defendant; and (2) as for the two 1980 transactions, there was the prior course of dealing and there was a price sheet that listed refining and handling charges but which did not mention any retainage fee.

The defendant does not dispute the district court's application of the law, but contends that the court's factual conclusions were clearly erroneous. Primarily, the defendant disputes whether the defendant's predecessor, owned by John Enright, maintained a 100% accountability. It argues, in essence, that 100% accountability could not have been an implied term of its contract with the plaintiff because the plaintiff never contracted with the defendant's predecessor to have 100% accountability.

The district court found that prior to the acquisition of the Enright Refining Company by the defendant, the plaintiff was never charged a retainage by Mr. Enright. This was not clearly erroneous. John Enright testified that he had a 100% accountability. This testimony is supported by the testimony of plaintiff's employees.

---

**1.** Neither party contests on this appeal the application of New Jersey law to either the fraud or

contract claims.

The defendant argues that Enright's testimony must be discounted because it is physically impossible to maintain a 100% accountability when some gold is inevitably unrecoverable in the refining process. The defendant confuses, however, the physical impossibility of recovering 100% of the gold with the business possibility of promising to account for 100% of the metal assayed in a shipment and making up for any physical loss through the refining fees. The testimony at trial indicated that the refining business is not like a dry cleaners where one sends a coat and receives the same, but cleaner, coat back. The plaintiff would send the defendant a shipment of gold and would not expect the same physical gold returned after refining. Rather, the plaintiff would expect only an agreed amount of fine gold in return; the agreed amount being stated as a percentage of the gold content of the original shipment. In this case, the district court found that the agreed percentage was 100%. Thus, the failure of the defendant to recover 100% of the gold in a shipment does not necessarily require that it account for less than 100% of the gold in settlement with the plaintiff under a tacit contractual term.

The defendant also contends that there was a usage of trade that would imply a term that some accountability would be assessed. The district court found that there was no such trade usage since there were several refiners that did not charge a retainage. Because a course of dealing between parties controls over a usage of trade, we need not address this contention. See N.J.Stat.Ann. § 12A:2–205 (1962).

Because none of the grounds asserted by the defendant for reversal of the breach of contract claim succeed, we agree with the district court that the defendant breached its contract with the plaintiff.

### III. FRAUD

■ There are four elements necessary for establishing a prima facie case of legal fraud under New Jersey law: (1) a material misrepresentation of a presently existing or past fact; (2) knowledge of the falsity by the person making the misrepresentation; (3) intent that the misrepresentation be relied upon; and (4) reliance on the misrepresentation. *Nappe v. Anschelewitz, Barr, Ansell & Bonello*, 97 N.J. 37, 477 A.2d 1224, 1232 (N.J.1984).

On this appeal, the defendant contends that there was no misrepresentation, that there was no evidence of intent to defraud, and that the plaintiffs reliance was unreasonable.

As for the plaintiff's transactions with the defendant between 1976 and 1977, the district court found that the defendant misrepresented its fees by failing to disclose the retainage assessment and by affirmatively concealing the retainage through misleading report letters. The defendant, however, contends that there was no misrepresentation because it disclosed the retainage in some of its report letters. The defendant points to three report letters introduced into evidence which it claims show the retainage fee. The defendant argues that for the shipments reported upon by these letters, it was possible to calculate the expected yield of fine gold after refining since the pre-refined weight of the gold is known, and the purity of the gold before refining, reported in karatage, was also known. Further, the defendant argues, if one were to engage in these calculations, as the evidence indicated that the plaintiff regularly did, the expected yield would be larger than the reported yield. Thus, the defendant concludes, the plaintiff must have actually known that there was a retainage.

■ The district court found, however, that "the percentage retained was relatively small, which made it impossible for Hirsch to discover the retainage." 577 F.Supp. at 344. It was stipulated that the retainage during this period was 0.5% and there was testimony that the plaintiff expected approximately a 1% deviation between the expected yield and the reported yield. The district court's conclusion that the plaintiff could not have detected the

retainage prior to 1980 was not clearly erroneous.[2]

As for the two 1980 transactions, the defendant contends that it disclosed its retainage fees in a meeting with the plaintiff's executives in 1977 or 1978. The district court found that the meeting occurred, but that no mention of accountability or retainage was made. Two of the plaintiff's employees testified that the meeting occurred but that there was no specific discussion on Enright's accountability charges. Although the defendant presented conflicting testimony, the determination of credibility was for the district court.

The defendant contends, however, that the testimony of one of the plaintiff's employees, Jerry Sachs, was not probative because he admitted to being absent for part of the meeting and thus may not have heard the discussion on accountability. However, the defendant's witnesses both testified that Sachs was present during the alleged discussion on accountability. But since Sachs clearly denies that accountability was discussed in his presence, the question of whether accountability was a subject of discussion at the meeting was for the trier of fact to determine. After reviewing the record, we hold that the district court's finding that the defendant failed to disclose its retainage fee at any time prior to the last shipment was not clearly erroneous.

Furthermore, the defendant's report letters constituted affirmative fraudulent concealment. The district court found that the defendant's report letters to the plaintiff were misleading and false. This finding was not clearly erroneous. The report letters failed to mention at any time that there was a retainage assessment. More importantly, the "assay" reported in some of the letters were false and misleading. It is clear from the record that "assay" means the gold content of the material shipped as determined by chemical tests. Yet the defendant used the word "assay" to mean the gold content of the material shipped after deducting its retainage. This is deliberately misleading because it suggests that the results of the chemical tests to determine gold content were less than the actual results. There is no justification anywhere in the record for the defendant's definition of the word "assay." By reporting the assay as it did, the defendant suggests that there was a 100% accountability since 100% of the contents reported by the "assay" are returned or paid for.

The defendant also contends that there was no evidence of an intent to defraud. The concealment of the retainage fee through falsification of the assay constituted evidence from which the district court could infer the intent to defraud. The district court's finding of intent is not clearly erroneous.

Finally, the defendant contends that the plaintiff's reliance was not justifiable. It argues that even if the plaintiff did not actually discover the retainage charges from the report letters, it should have known from its report letters that there was some retainage.

It is not entirely clear to what extent New Jersey law requires that the reliance be justifiable. The New Jersey Supreme Court has said, "One who engages in fraud ... may not urge that one's victim should have been more circumspect or astute." *Jewish Center v. Whale*, 86 N.J. 619, 432 A.2d 521, 524 (1981). *But see Nappe v. Anschelewitz, Barr, Ansell & Bonello*, 189 N.J.Super. 347, 460 A.2d 161, 165 (N.J.Super.A.D.1983), *rev'd on other grounds*, 97 N.J. 37, 477 A.2d 1224 (N.J.1984). The general rule in the United States, however,

---

**2.** Further, there are several assumptions in defendant's calculations which were unsupported by the record. Most importantly, the meaning of the term "14K" was not, as defendant contends, 14/24ths pure gold. During most of the relevant period, "14K" meant 13.5/24ths pure gold. If 13.5/24ths were substituted into defendant's calculations, the difference between the expected yield and the reported yield was approximately 1%. If we were to engage in the calculations suggested by the defendant, using the exact method used by the plaintiff in checking gold returns, we would find a deviation of less than 1%. *See App.* at 90–91.

is that reliance must be justifiable. Restatement of Torts (Second) § 537 (1977).

■ We do not need to reach this legal question because we believe that even if New Jersey required justifiable reliance, the defendant's contentions would fail because the district court apparently found that the plaintiff's reliance was justifiable. Although the district court did not specifically state that the reliance was justifiable, it did find that the retainage assessed prior to the last shipment was impossible to discover. 577 F.Supp. at 344. This finding, as discussed earlier, was not clearly erroneous.

Because we are not persuaded that the district court erred in its determination, we hold that the evidence supports the conclusion that the defendant committed fraud.

### IV. RICO

The district court found that the defendant's conduct constituted a civil violation of a subsection of RICO, 18 U.S.C. § 1962(c) (1983). Section 1962(c) provides that:

It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

The defendant contends that under the language of section 1962(c), the "person" subject to liability cannot be the same entity as the "enterprise." In this case, the person charged with liability, the defendant, is the same entity as the entity fulfilling the enterprise requirement. Because there is no "enterprise" which is independent of or separate from the defendant, it is contended that the RICO judgment must be reversed.

The language of section 1962(c) supports the defendant's argument. Under that subsection, the "person" must be employed by or associated with an "enterprise." The Enright Refining Company, Inc. clearly is not employed by the Enright Refining Company, Inc.; nor is it logical to say that the Enright Refining Company, Inc. is associated with the Enright Refining Company, Inc. Thus, the language contemplates that the "person" must be associated with a separate "enterprise" before there can be RICO liability on the part of the "person."

Most of the courts of appeals that have considered this issue have agreed that the "person" charged with the RICO violation cannot be the same entity as the "enterprise" under section 1962(c). *United States v. Computer Sciences Corp.,* 689 F.2d 1181, 1190–91 (4th Cir.1982), *cert. denied,* 459 U.S. 1105, 103 S.Ct. 729, 74 L.Ed.2d 953 (1983); *Bennett v. Berg,* 685 F.2d 1053, 1061 (8th Cir.1982), *aff'd en banc,* 710 F.2d 1361, *cert. denied,* —— U.S. ——, 104 S.Ct. 527, 78 L.Ed.2d 710 (1983); *Rae v. Union Bank,* 725 F.2d 478 (9th Cir.1984); *Haroco, Inc. v. American National Bank and Trust Co.,* 747 F.2d 384 (7th Cir.1984). The Court of Appeals for the Eleventh Circuit is the only appellate court that has come to a different conclusion. *United States v. Hartley,* 678 F.2d 961, 988–89 (11th Cir.1982), *cert. denied,* 459 U.S. 1183, 103 S.Ct. 834, 74 L.Ed.2d 1027 (1983).

The court in *Hartley* based its decision in large part on its conclusion that to read "person" as separate from the "enterprise" would permit a corrupt corporation to evade punishment. Several courts have suggested, including the court in *Hartley,* that the result in *Hartley* could have been sustained if the indictment had been reworded, or possibly if the corporation had been charged under a different RICO provision. *Hartley,* 678 F.2d at 989. *See also Bennett,* 685 F.2d at 1061–62, *Haroco,* at 399–402 (suggesting that § 1962(a) would permit the enterprise to be charged with a RICO offense). Thus, the rationale of the *Hartley* case is significantly undercut.

We believe that the majority view best comports with Congressional intent. One of the Congressional purposes in enacting RICO was to prevent the takeover of legitimate businesses by criminals and corrupt

organizations. *See United States v. Turkette,* 452 U.S. 576, 591, 101 S.Ct. 2524, 2532, 69 L.Ed.2d 246 (1981); *United States v. Frumento,* 563 F.2d 1083, 1090, (3d Cir. 1977), *cert. denied,* 434 U.S. 1072, 98 S.Ct. 1256, 55 L.Ed.2d 775 (1978). It is in keeping with that Congressional scheme to orient section 1962(c) toward punishing the infiltrating criminals rather than the legitimate corporation which might be an innocent victim of the racketeering activity in some circumstances.

■ The plaintiff has pointed to several district court opinions in this circuit that have not required that the "person" be an entity separate from the "enterprise" for section 1962(c) purposes. Notably, the plaintiff directs our attention to *United States v. Local 560,* 581 F.Supp. 279 (D.N.J.1984). In that case, although the district court suggested that the "person" and the "enterprise" requirement of section 1962(c) might be met by a single entity, it only held that the same group of individuals may be considered as "person" for section 1962(b) purposes and as an "enterprise" for section 1962(c) purposes. It does not appear that the same entity was charged as the "person" and the "enterprise" for the section 1962(c) violation. We believe that the case in *Local 560* is distinguishable, and we express no opinion on the merits of the district court's conclusions. We hold only that a violation of section 1962(c) by a corporate entity requires an association with an enterprise that is not the same corporation.

The plaintiff also alleges a violation of section 1962(a). The district court did not reach the question of whether the plaintiff successfully made out a section 1962(a) violation. We, therefore, remand to the district court to consider whether the evidence establishes a section 1962(a) violation and whether the plaintiff has established the elements necessary to present a civil cause of action for a violation of section 1962(a). *See* 18 U.S.C. § 1964(c) (1983).

## V. DAMAGES

■ The defendant contends that the district court applied the wrong measure of damages for the fraud and breach of contract claims. The district court apparently awarded the full stipulated value of the gold and silver "not returned" by the defendant. The defendant argues that since the plaintiff would have had to pay some retainage fees if it had employed another refiner, the damages must be reduced. The correct measure of damages for breach of contract is the expectation measure or the "benefit of the bargain". *Donovan v. Bachstadt,* 91 N.J. 434, 453 A.2d 160, 165 (1982). *See also* N.J.Stat.Ann. 12A:1-106(1). In New Jersey, the benefit of the bargain may be used as the measure of damages for fraud as well. *Zeliff v. Sabatino,* 15 N.J. 70, 74-75, 104 A.2d 54, 56 (1954); *Gardner v. Rosecliff Realty Co.,* 41 N.J.Super. 1, 124 A.2d 30 (N.J.Super.A.D.1956). In this case, the district court found that the defendant promised to account for 100% of the gold and silver content in the shipment as determined by chemical assay. The district court correctly awarded the full value of the gold and silver retained because that would put the parties in the same position as if the contract or promise had been fulfilled. There was no error in the calculation of damages.

## VI.

The judgment of the district court insofar as it is based on the breach of contract and fraud claims will be affirmed. The judgment of the district court insofar as it is based on a violation of section 1962(c) of RICO will be vacated, and the case will be remanded for further proceedings consistent with this opinion. Two-thirds of the costs will be assessed against the defendant, and one-third against the plaintiff.