In re Judith Carol McGINTY, Debtor.

Joseph DeWane and Celeste
LaChapelle, Plaintiffs,

v.

Judith Carol McGinty, Defendant.

Bankruptcy No. 97–25269.
Adversary No. 97–2296.

United States Bankruptcy Court,
N.D. Mississippi.

Dec. 21, 2000.

James T. Allison, Memphis, TN, James W. Amos, Hernando, MS, for debtor.

Michael Coury, David M. Dunlap, Memphis, TN, William Dye, Oxford, MS, William M. Monroe, Memphis, TN, Jeff D. Rawlings, Madison, MS, Nina S. Tollison, Oxford, MS, for creditors.

## OPINION

DAVID W. HOUSTON, III, Bankruptcy Judge.

On consideration before the court is a complaint filed by the plaintiffs, Joseph DeWane and Celeste LaChapelle, against the defendant/debtor, Judith Carol McGinty; answer and affirmative defenses having been filed by said defendant; all issues having been appropriately joined; and, after a trial on the merits, the court hereby finds as follows, to-wit:

### I.

The court has jurisdiction of the parties to and the subject matter of this proceeding pursuant to 28 U.S.C. § 1334 and 28 U.S.C. § 157. This is a core proceeding as defined in 28 U.S.C. § 157(b)(2)(A), (I), (J), and (O).

### II.

In the pretrial order, the plaintiffs described their causes of action as follows:

A. McGinty and Hearn have engaged in activity prohibited by 18 U.S.C. § 1962(c). While employed by or

associated with the enterprise of Dean's Farms Antiques, they conducted or participated in the conduct of the enterprise's affairs through a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(c).

B. McGinty, Hearn, Dean Farms Antiques, and Dean Farms knowingly submitted invoices to LaChapelle and DeWane which were false and misleading, and made intentionally misleading and material misrepresentations of fact to LaChapelle and DeWane with the intent to deprive LaChapelle and DeWane of large sums of money. LaChapelle and DeWane relied to their detriment upon the representations.

C. The transactions between McGinty, d/b/a Dean Farms Antiques, Dean Farms, Hearn, and the Plaintiffs constituted an investment contract which is a "security" within the meanings of Section 2 and 5 of the Securities Act of 1933, 15 U.S.C. § 77 and 15 U.S.C. § 77e respectively. McGinty and Hearn, as control persons for Dean Farms Antiques, acted with the intent to deceive, manipulate and defraud Plaintiffs by making untrue statements of material fact regarding the investment contracts and the value of the goods and by omitting material facts which were necessary to make the statements made, in light of the circumstances in which they were made, not misleading.

D. Hearn and McGinty, with intent to hinder, delay, or defraud their creditors, have transferred, removed, destroyed, mutilated, or concealed property of their respective estates within one year before the date of the filing of the petition. Hearn and McGinty have concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records and papers from which their financial condition or business transactions might be ascertained, without justification.

The plaintiffs further set forth a summary of the ultimate facts supporting their claims as follows:

The Plaintiffs shall prove that the Defendants perpetrated a fraud upon them in a securities investment scheme whereby the Defendants took huge sums of money from the Plaintiffs as an "investment" with a promise that the "principal" would be returned to the Plaintiffs in a short period of time along with "interest" on the "principal" investment. This scheme also breached the RICO laws of the United States, as well as, the fiduciary duty of the Defendants to the Plaintiffs. These investments were represented to be without risk to the Plaintiffs. Defendants also fraudulently represented that certain goods which were sold to the Plaintiffs were of a given value and quality when, in fact, the goods were not of the stated value or quality. Defendants have failed to keep accurate records as a part of the scheme in order to frustrate inquiries by the "investors." The scheme has caused substantial damages to the Plaintiffs.

In her defense, McGinty set forth her summary of the ultimate facts as follows:

The Defendant, Judith McGinty, admits that in 1989 she and Plaintiff, LaChapelle, invested together in the purchase and resale of art and antiques and shared the profits on a pro-rata basis. That in the early 1990's LaChapelle introduced McGinty to DeWane. DeWane asked McGinty to decorate his office and

his home. Many of the purchases made for the office and home were sold to DeWane at a price that included a commission for both McGinty and LaChapelle. Because the investments made by McGinty and LaChapelle were profitable, DeWane asked McGinty to include him on similar investments, which she did. There were basically two investments involving DeWane, although various amounts of money were given to McGinty in each investment as opposed to a single amount. The first investment was successfully completed, but the resale purchaser in the second investment became involved in a lengthy divorce and could not purchase the art work that McGinty had acquired with DeWane's money. McGinty offered to return the art work to him at DeWane's request.

McGinty admits that she owes DeWane $120,000.00, plus reasonable interest, but claims a credit for the value of the art work returned to him. McGinty denies that she owes anything to LaChapelle.

Thereafter, the parties stipulated to the following facts:

A. McGinty has pled guilty to a felony bad check charge in connection with antique business dealings with Curtis Spangler.

B. Joseph DeWane is a physician practicing medicine in Memphis, Tennessee.

C. Celeste LaChapelle is a registered nurse working in Memphis, Tennessee.

D. Judith McGinty is an expert in the buying and selling of antiques, art, and other collectible objects.

E. There was never any formal contractual agreement between McGinty and LaChapelle regarding their business ventures. The same is true for DeWane.

F. The checks attached to the Complaint that were written by McGinty to either LaChapelle or DeWane were dishonored by McGinty's bank for the reasons stated thereon.

G. The real property known as Dean Farms, located in DeSoto County, Mississippi, was purchased by McGinty and her mother Alice Hearn in December, 1986, with title having been taken in both of their names. On May 14, 1996, McGinty transferred her interest in Dean Farms to Alice Hearn. In August and October, 1997, Hearn and McGinty filed Chapter 11 bankruptcy cases, and in October, 1998, Dean Farms was sold by auction for a high bid that netted a total of $500,000.00.

H. Judith McGinty and Alice Hearn obtained 40 acres of land and improvements by deed from Mary A. Puckett Sewell and Joseph Sewell by Warranty Deed recorded in Deed Book 192, Page 456.

I. Alice Hearn obtained Judith McGinty's interest in the real property by deed recorded in Deed Book 300, Page 638.

J. Alice M. Hearn is the mother of Judith McGinty.

### III.

The above captioned adversary proceeding was consolidated for trial with a proceeding styled *Joseph DeWane and Celeste LaChapelle, Plaintiffs, versus Alice M. Hearn, Defendant,* Adv.Proc. No. 97–2295. At the conclusion of the plaintiffs' proof, the court sustained a motion by the defendant, Hearn, to dismiss the complaint against her. A final order was entered on

October 6, 1999, which was not appealed and now has become final.

## IV.

As a part of this proceeding, as noted earlier, the plaintiffs sought to set aside as a fraudulent conveyance a transfer of real property, known as Dean Farms, from McGinty to Hearn pursuant to § 15–3–3, Miss.Code Ann. However, in a separate adversary proceeding filed by James M. Patton and Judy W. Patton against both McGinty and Hearn, the court set aside the transfer of McGinty's interest in the said real property. The property was thereafter vested equally in the estates of McGinty and Hearn. Pursuant to separate court orders, the property was sold at auction and the proceeds were distributed to Hearn, who claimed a homestead exemption in the property, and then to judgment creditors according to the priority of their respective liens. Insofar as the current adversary proceeding is concerned, this issue is now moot.

## V.

In an effort to show a pattern of deceptive conduct on the part of McGinty, the plaintiffs introduced evidence of the following:

A. That McGinty pled guilty to a felony bad check charge in connection with antique business dealings with Curtis Spangler.

B. That James M. Patton and Judy W. Patton obtained a default judgment against McGinty on November 20, 1996, based on a complaint for fraud and deceit in the Chancery Court of Shelby County, Tennessee. This judgment, in the sum of $285,650.00, was subsequently enrolled in DeSoto County, Mississippi.

C. That William P. Chandler obtained a judgment against McGinty, as well as, Hearn, on February 21, 1997, in the Chancery Court & Shelby County, Tennessee, in the sum of $120,000.00, plus costs and attorney's fees. This judgment was based on the issuance of an insufficient funds check.

As noted earlier, the court dismissed the complaint filed against Hearn. There was also no proof offered to establish that Dean Farms and/or Dean Farms Antiques were anything more than trade names utilized by McGinty. These factors substantially dilute the plaintiffs' claims filed pursuant to 18 U.S.C. § 1962(c), the federal Racketeer Influenced and Corrupt Organizations Act (RICO). A brief discussion of the legal ramifications of these claims will be set forth hereinbelow.

## VI.

Joseph DeWane is a licensed physician who practices medicine in Memphis, Tennessee. His claims against McGinty can be categorized as follows:

A. Participation in an "investment scheme" orchestrated by McGinty.

B. The acquisition of Leroy Neiman art works McGinty at exaggerated prices.

C. The acquisition of watercolors produced by Charles Gilbert Heathcote from McGinty at exaggerated prices.

From his court appearance, Dr. DeWane conveyed the impression that he is a decent, honest individual. He would not, however, be considered an unintelligent, naive investor in the business world.

Celeste LaChapelle is a registered nurse, who, at the time of this trial, was employed at the Clinic of Plastic and Reconstructive Surgery in Memphis, Tennessee. LaChapelle was a close personal friend of McGinty's and had been involved

with her for numerous years with investments in antiques, art works, and furniture. Indeed, on many transactions, McGinty paid commissions to LaChapelle, specifically when she sold furniture and the art produced by Leroy Neiman to DeWane. As such, LaChapelle could certainly not be considered an uninformed participant in her dealings with McGinty. Her claims against McGinty can be categorized as follows:

A. Participation in an "investment scheme" orchestrated by McGinty.

B. The wrongful conversion of an oriental rug which was owned by LaChapelle, but entrusted to McGinty for a prospective consignment sale.

## VII.

### DeWane Investments

DeWane invested $690,000.00 with McGinty exclusively for the purchase and resale of works of art. He was repaid by McGinty the sum of $710,000.00. This investment program commenced on November 11, 1994, and terminated on July 14, 1995. According to the plaintiffs' expert witness, Stephen Lieb, a certified public accountant, the damages claimed by DeWane are set forth as follows:

(Plaintiffs' Exhibit 174)

| | |
|---|---|
| Principal invested | $ 690,000.00 |
| Computed interest | 687,500.00 |
| Total due | $1,377,500.00 |
| Less: payments received | 710,000.00 |
| Total outstanding | $ 667,500.00 |

Of the total outstanding, $297,000.00 allegedly represents unpaid principal, while $370,500.00 allegedly represents unpaid interest.

### LaChapelle Investments

LaChapelle invested $972,536.00 with McGinty. She was repaid the sum of $961,300.00. This investment program commenced on October 20, 1989, and ter-

minated on August 24, 1996. According to Stephen Lieb, the damages claimed by LaChapelle are set forth as follows:

(Plaintiffs' Exhibit 175)

| | |
|---|---|
| Principal invested | $ 972,536.00 |
| Computed interest | 1,129,924.00 |
| Total due | $2,102,460.00 |
| Less: payments received | 961,300.00 |
| Total outstanding | $1,141,160.00 |

According to the exhibit, in addition to the payments received totaling $961,300.00, LaChapelle also received $27,778.00 in other payments from McGinty which were related to commissions earned on furniture sales. The total outstanding is comprised of unpaid principal in the alleged sum of $638,500.00, and unpaid interest in the alleged sum of $502,660.00.

McGinty testified that some of the checks that LaChapelle wrote to her were for personal purchases rather than investments. She indicated that these checks should not have been included by Lieb in his $972,536.00 total. Exhibit 175 corroborates that LaChapelle had a lengthy history of business dealings with McGinty.

LaChapelle indicated that she borrowed significant sums of money to make these investments from Henry Wetter, and still owes him approximately $371,000.00. The evidence also reflected that LaChapelle, during this period of time, expended significant sums of money for what appeared to be personal reasons. These expenditures are shown through her repayment of her credit card obligations.

### Comments Concerning the Investment Allegations

Lieb's accounting and report presumes a guaranteed 20% to 30% return on each dollar invested by DeWane and LaChapelle. Lieb added the anticipated profit to the principal investment as if it were interest and compounded it quarterly. (See

Plaintiff's Exhibits Nos. 174, 175, 175(a), and 175(b).) This calculation is exorbitant if not usurious. There is absolutely no legal authority to support Lieb's computations, certainly not the quarterly compounding of the anticipated profits at rates of 20% to 30% per annum. There is no realistic way in which McGinty could repay these investments under the scenario concocted by Lieb.

There were numerous invoices and writings indicating that McGinty contemplated a return to the plaintiffs on their investments. However, many of these documents were incomprehensible, and the precise intent of many of them was unintelligible. In this context, the court notes that the parties stipulated that there was no formal contractual agreement between them.

▮ Regardless, all of the representations, written and verbal, made by McGinty were purely promissory in nature. As such, they do not constitute actionable fraud without proof of a present undisclosed intent not to perform when the representations were made. This is an onerous burden of proof that the plaintiffs must carry. They have not done so in this proceeding.

In *In re Posey,* 57 B.R. 858 (Bankr. N.D.Miss.1985), this court examined Mississippi authority which holds that the mere failure to perform a promise does not constitute actual fraud:

> " .... It is the general rule that fraud cannot be predicated upon statements which are promissory in their nature when made and which relate to future actions or conduct, upon the mere failure to perform a promise—nonperformance of a contractual obligation—or upon failure to fulfill an agreement to do something at a future date...... 'mere promise to perform an act in the future is not, in a legal sense, a representation,

and that a mere failure to perform it does not change its character' .... "

*Credit Industrial Co. v. Adams County Lumber and Supply Co.,* 215 Miss. 282, 60 So.2d 790, 794 (1952) *quoted in, In re Posey,* 57 B.R. 858, 862 (Bankr.N.D.Miss. 1985)..

The law in Tennessee is identical. In the case of *McElroy v. Boise Cascade Corp.,* 632 S.W.2d 127 (Tenn.Ct. of Appls., 1982), the court concluded as follows:

> The misrepresentation must consist of a statement of a material past or present fact. *Haynes v. Cumberland Builders, Inc.,* [546 S.W.2d 228] supra at 232 [(Tenn.Ct.App.1976)]. See also *Cumberland Portland Cement Co. v. Reconstruction Finance Corp.,* 140 F.Supp. 739, 751 (E.D.Tenn.1953), aff'd. 232 F.2d 930 (6th Cir.1956). Thus, statements of opinion or intention are not actionable. See *Fowler v. Happy Goodman Family,* 575 S.W.2d 496 (Tenn.1978); *Hamilton v. Galbraith,* 15 Tenn.App. 158, 166 (1932); *Cumberland Portland Cement Co. v. Reconstruction Finance Corp.,* supra at 751. Likewise, puffing or other sales talk is generally not actionable. *Sunderhaus v. Perel & Lowenstein,* 215 Tenn. 619, 388 S.W.2d 140 (1965). Similarly, conjecture or representations concerning future events are not actionable even though they may later prove to be false. *Young v. Cooper,* 30 Tenn.App. 55, 203 S.W.2d 376 (1947). See *Brungard v. Caprice Records, Inc.,* 608 S.W.2d 585, 590 (Tenn.App.1980); Cf. *Springer v. Bank of Douglas,* 82 Ariz. 329, 313 P.2d 399 (1957).

*McElroy v. Boise Cascade Corp.,* 632 S.W.2d at 130.

There has been no proof introduced to the effect that McGinty had a present undisclosed intent not to repay both DeWane and LaChapelle when she promised to do

so. Indeed, the history and magnitude of the payments that she did make are indicative of an intent to repay. Of significant importance is the fact that the plaintiffs received a return of all of the money that they actually invested with McGinty. They simply did not receive the 20% to 30% anticipated profit.

In this context, the court notes that Lieb testified that DeWane received $40,000.00 more than he invested ($710,000.00 repaid less $670,000.00 invested) in an eight month period of time.

The court has observed in the pretrial order that McGinty stipulated that she still owed DeWane $120,000.00. This, of course, does not comport with the evidence offered at trial. This discrepancy was mentioned to the attorneys representing the parties during a post-trial status conference. McGinty's attorney indicated that he was aware that the stipulation was not supported by the proof, but that he had been advised by McGinty early in the case that she felt that she still owed De-Wane $120,000.00.

Regardless, the court is of the opinion that McGinty's representations concerning the return on DeWane's investments were promissory in nature and, as such, cannot sustain a cause of action based on fraud. Even if McGinty owes DeWane $120,000.00, the debt would still be dischargeable in her bankruptcy case.

The plaintiffs have also alleged that the investment opportunities orchestrated by McGinty constituted a "Ponzi Scheme." However, there has been no "linking" evidence introduced that conclusively established that McGinty was using other investors' monies to repay DeWane and LaChapelle, or that she was using their monies to repay third parties. While other individuals were certainly involved with McGinty, for example, James Patton and William Chandler, there was no showing that their monies were "pooled" or "kited" in connection with the monies advanced by DeWane and LaChapelle.

### Acquisition of Leroy Neiman Art Works by DeWane

█ The parties stipulated that McGinty was an expert in the buying and selling of antiques, art, and other collectible objects. McGinty represented to DeWane that the Neiman works were being acquired from a private collection, while, in fact, she was actually purchasing them from Peter Lane Fine Arts Corp., in Ft. Lauderdale, Florida. Invoices introduced by McGinty reflect the prices that she paid for these works. (Defendant's Exhibit No. 20.) Another exhibit (Defendant's Exhibit No. 21), prepared on Knoedler Publishing, Inc., stationery, reflects the suggested retail prices for the Neimans as of April 15, 1990. The numbers on this exhibit are dramatically higher than the prices reflected on the invoices which represent the sales to McGinty. Unfortunately, there was no evidence introduced to reflect the exact price paid by DeWane to McGinty. Therefore, the court is unable to determine whether he paid an outrageously inflated price for the Neimans. Even though McGinty's representations to De-Wane about the source of this collection were not true, the court is simply unable to calculate DeWane's damages, if any. The court would note, however, that there are several checks payable to LaChapelle from McGinty indicating that LaChapelle received sizeable commissions from McGinty as a result of the Neiman transactions with DeWane.

### Acquisition of Heathcote Watercolors by DeWane

█ It is undisputed that DeWane purchased McGinty nineteen Heathcote watercolors at prices ranging from $5,000.00 to $7,000.00 each. McGinty had acquired

these paintings from Cora Dobson at prices ranging from $1,800.00 to $2,000.00 each. (Plaintiffs' Exhibits Nos. 148 and 150)

Carol Thompson, an expert witness as to art history and art appraisal, valued the paintings at $250.00 each or an aggregate value for the collection of $4,000.00. While Thompson initially appeared to be a credible, impressive witness, following cross-examination, this court has determined that the weight to be given to her testimony should be significantly reduced. McGinty's counsel introduced a fifty-five page booklet entitled *The Watercolors of Charles Gilbert Heathcote, a Catalog Essay* by Cora S. Dobson. (Defendant's Exhibit No. 19) This booklet was prepared in connection with an exhibition of the watercolors at The Dixon Gallery and Gardens in Memphis, Tennessee. This exhibit indicates that not only were these watercolors exhibited at The Dixon Gallery and Gardens, but that a tremendous amount of effort and research was undertaken relative to the exhibition. Having seen this evidence, the court is of the opinion that Thompson's evaluation of the Heathcotes was unrealistically low.

The best evidence of the Heathcotes' value, in the opinion of the court, is the price paid by McGinty to Dobson as noted hereinabove. Although DeWane paid a significantly higher price for each painting, this is not indicative of actionable fraud, particularly in the absence of fraudulent representations. Although McGinty's conduct is certainly distasteful, exploiting her friendship with DeWane to charge him highly inflated prices, she did not defraud DeWane who could have easily made an independent evaluation of these purchases.

*The Conversion of LaChapelle's Oriental Rug*

■ Without contradiction, LaChapelle paid $5,000.00 to McGinty for the acquisition of an oriental rug. Thereafter, the rug was entrusted to McGinty who placed the rug with Curtis Spangler for purposes of a consignment sale. This sale apparently never materialized and McGinty regained possession of the rug. (Plaintiffs' Exhibit No. 184) She never returned the rug to LaChapelle, nor did she account for its proceeds. The court is, therefore, of the opinion that McGinty wrongfully converted LaChapelle's property which had been entrusted to her. As such, the debt in the sum of $5,000.00 should be excepted from discharge in McGinty's bankruptcy case.

## VIII.

■ In the pre-trial order, the plaintiffs indicated that a part of their cause of action against McGinty was being brought under 18 U.S.C. § 1962(c), the federal Racketeer Influenced and Corrupt Organization Act (RICO). This section provides as follows:

18 U.S.C. § 1962(c) provides as follows:

It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprises' affairs through a pattern of racketeering activity or collection of unlawful debt.

The constituent elements of this section are broken out as follows:

(1) a person,

(2) employed by or associated with an enterprise,

(3) the activities of which affect interstate or foreign commerce,

(4) the person conducts or participates, directly or indirectly, in the conduct of the enterprise's affairs

(5) through a pattern of racketeering activity or collection of unlawful debt.

"Person" and "enterprise" are defined in 18 U.S.C. § 1961 at (3) and (4) respectively: " 'person' includes any individual or entity capable of holding a legal or beneficial interest in property"; " 'enterprise' includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity."

■ In a majority of circuits "person" and "enterprise" must be distinct in order to state a claim under § 1962(c). See, *U.S. v. Computer Sciences Corp.*, 689 F.2d 1181 (4th Cir.1982), *cert. denied*, 459 U.S. 1105, 103 S.Ct. 729, 74 L.Ed.2d 953 (1983); *Haroco, Inc. v. American National Bank & Trust Co. of Chicago*, 747 F.2d 384 (7th Cir.1984), *aff'd*, 473 U.S. 606, 105 S.Ct. 3291, 87 L.Ed.2d 437 (1985); *Rae v. Union Bank*, 725 F.2d 478 (9th Cir.1984); *Bennett v. Berg*, 685 F.2d 1053 (8th Cir.1982), *aff'd in part and rev'd in part*, 710 F.2d 1361 (8th Cir.1983), *cert. denied*, 464 U.S. 1008, 104 S.Ct. 527, 78 L.Ed.2d 710 (1983); *Hirsch v. Enright Refining Co.*, 751 F.2d 628 (3rd Cir.1984); *Bennett v. United States Trust Co. of New York*, 770 F.2d 308 (2nd Cir.1985); *cert denied*, 474 U.S. 1058, 106 S.Ct. 800, 88 L.Ed.2d 776 (1986). Only the Eleventh Circuit has adopted a contrary rule. *See, United States v. Hartley*, 678 F.2d 961 (11th Cir.1982), *cert. denied*, 459 U.S. 1170, 103 S.Ct. 815, 74 L.Ed.2d 1014 (1983).

In *Petro–Tech, Inc. v. Western Co. of North America*, 824 F.2d 1349 (3rd Cir. 1987), the Court discussed several of the cases cited in the paragraph immediately preceding, particularly *Hirsch v. Enright Refining Co.*, supra. The following comment is informative:

We explained in *Enright* that § 1962(c) was drafted in such a way that Congress must have intended the "person and the enterprise" to be distinct entities under that provision. Under the language of that provision, we held,

The person must be employed by or associated with an "enterprise." The Enright Refining Company, Inc., clearly is not employed by the Enright Refining Company, Inc.; nor is it logical to say that the Enright Refining Company, Inc., is associated with the Enright Refining Company, Inc. Thus the language contemplates that the "person" must be associated with a separate "enterprise" before there can be RICO liability on the part of the "person."

*Petro–Tech, Inc.*, 824 F.2d at 1359 (citing *Hirsch v. Enright*, 751 F.2d at 633).

In *Bishop v. Corbitt Marine Ways, Inc.*, 802 F.2d 122 (5th Cir.1986), the Fifth Circuit adopted the majority view when it affirmed the trial court's dismissal of a RICO claim because "the plaintiff alleged that the RICO 'person' and the RICO 'enterprise' were one and the same ...", *Id.* at 122.

In *Atkinson v. Anadarko Bank and Trust Co.*, 808 F.2d 438 (5th Cir.) *cert. denied*, 483 U.S. 1032, 107 S.Ct. 3276, 97 L.Ed.2d 780 (1987), the Fifth Circuit affirmed the issuance of a judgment notwithstanding the verdict which left intact a jury finding of common law fraud and breach of contract, but ignored the jury finding of a RICO violation. *Atkinson* involved a lawsuit against a bank which charged higher than the contractually agreed upon interest rate. The original complaint alleged a civil RICO violation, as well as, common law fraud and breach of contract, all as a result of the interest overcharge. However, the complaint defectively alleged that the culpable person, Anadarko Bank, was also the enterprise.

The trial court noted the error and permitted the plaintiff to amend the complaint.

The amended complaint again identified the culpable person as being Anadarko Bank, but identified the enterprise as being an "association in fact" consisting of the bank, its holding company, and three bank employees.

The *Atkinson* court cited several appropriate authorities: "The existence of an enterprise is an essential element of a RICO claim." *Sedima v. Imrex Co.*, 473 U.S. 479, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985); "To establish an 'association in fact' enterprise ... plaintiffs must show evidence of an ongoing organization, formal or informal, and ... evidence that the various associates function continuing unit." *United States v. Turkette*, 452 U.S. 576, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981); "The enterprise must be 'an entity separate and apart from the pattern of activity in which it engages.'" *Turkette*, 452 U.S. at 583, 101 S.Ct. 2524. The court then offered the following:

> The record here contains no evidence that the bank, its holding company, and the three employees were associated in any manner apart from the activities of the bank. Plaintiffs wholly failed to establish the existence of any entity separate and apart from the bank. In this case, the alleged racketeering activity forming the predicate of the RICO charge was mail fraud—the mailing of false statements requesting payment of interest in excess of the agreed amount. The mailing of loan statements was an activity of the bank. There is no evidence of any other activity on the part of the alleged enterprise.

*Atkinson*, 808 F.2d at 441. *See also; Montesano v. Seafirst Commercial Corp.*, 818 F.2d 423 (5th Cir.1987).

As noted hereinabove, the court dismissed the complaint against McGinty's mother, Alice Hearn, at the conclusion of the plaintiffs' proof. Additionally, Dean Farms and Dean Farms Antiques were only trade names utilized by McGinty. As such, there is no enterprise separate and apart from McGinty. Therefore, the plaintiffs' cause of action under 18 U.S.C. § 1962(c) is not well taken and must be dismissed.

Although it was not raised in the pretrial order, the court is compelled to address 18 U.S.C. § 1962(a), which was discussed by the plaintiffs in their post-trial memorandum. It provides in relevant part as follows:

> It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity ... to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

The constituent elements of § 1962(a) are broken out as follows:

(1) a person

(2) who has received any income derived, directly or indirectly, from a pattern of racketeering activity

(3) who uses, directly or indirectly, any part of such income, or the proceeds of such income

(4) in the acquisition of any interest in, the establishment, or operation of any enterprise

(5) which is engaged in, or the activities or which affect interstate or foreign commerce.

The Seventh Circuit has held in *Haroco, Inc. v. American National Bank and Trust Co., supra.*, that unlike § 1962(c)

causes of action, the liable RICO person and the RICO enterprise do not have to be separate entities in causes of action brought under § 1962(a). The following language is instructive:

> Subsection (a) does not contain any of the language in subsection (c) which suggest that the liable person and the enterprise must be separate. Under subsection (a), therefore, the liable person may be a corporation using the proceeds of a pattern of racketeering activity in its operations. This approach to subsection (a) thus makes the corporation—enterprise liable under RICO when the corporation is actually the direct or indirect beneficiary of the pattern of racketeering activity, but not when it is merely the victim, prize, or passive instrument of racketeering. This result is in accord with the primary purpose of RICO, which after all, is to reach those who ultimately profit from racketeering, not those who are victimized by it.

*Haroco*, 747 F.2d at 402.

■ As noted earlier, the court has concluded that McGinty was not guilty of fraudulent conduct. Her representations were promissory in nature and there was no proof that she had a present undisclosed intent not to perform when she made the representations. Although McGinty was guilty of writing insufficient funds checks, there is no legal nexus between this activity and the allegations of fraud related to the investments orchestrated by McGinty. Accordingly, there has been no evidence introduced to establish that McGinty was involved in a pattern of racketeering activities when she made representations to DeWane and LaChapelle. As such, a cause of action against McGinty under 18 U.S.C. § 1962(a) not well taken.

## IX.

■ The United States Supreme Court defined an investment contract under the 1933 and 1934 Securities Acts in *Securities and Exchange Commission v. W.J. Howey Co.*, 328 U.S. 293, 298–99, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946) as "a contract, transaction, or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party." The Court restated the definition in *United Housing Foundation, Inc. v. Forman*, 421 U.S. 837, 853, 95 S.Ct. 2051, 44 L.Ed.2d 621 (1975), as "an investment in a common venture premised on a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others."

In *Long v. Shultz Cattle Co., Inc.*, 881 F.2d 129 (5th Cir.1989), the Fifth Circuit provided that in order to determine whether a contract is an investment contract for purposes of the Securities Acts, there are three elements which must be established, to-wit: (1) an investment of money, (2) in a common enterprise, and (3) with profits to come solely from the efforts of others. In its opinion, the Fifth Circuit noted that there was a disagreement among the circuits as to what proof was necessary to establish a "common enterprise." The court indicated that the Third, Sixth, and Seventh Circuits follow a "horizontal commonality" approach, which requires investors to pool their assets together in order to meet the common enterprise requirement. If the investors do not share the profits and losses on a pro-rata basis, there is no common enterprise. The court then pointed out that the Fifth, Ninth, and Eleventh Circuits follow a "vertical commonality" approach in which the critical factor is not the similarities between the investors, but the uniformity of the impact of the promoter's decisions.

Perhaps, in the Fifth Circuit, the investments orchestrated by McGinty for DeWane and LaChapelle could be labeled as "investment contracts." However, these transactions occurred predominantly in the State of Tennessee and, as such, would be determinable under Sixth Circuit authority. The plaintiffs would, therefore, have to establish that they shared profits and losses on a pro-rata basis. Of course, this was not done.

■ Regardless, the court has already concluded that McGinty's conduct did not rise to the level of actionable fraud as to the investment representation made to DeWane and LaChapelle. Therefore, that part of the plaintiff's complaint asserting that McGinty violated §§ 2 and 5 of the Securities Act of 1933, 15 U.S.C. § 77 and 15 U.S.C. § 77(e), is not well taken and must be dismissed.

## X.

This court does not condone the activities of McGinty. While she exploited her friendship, particularly with DeWane, she was not guilty of fraud in a legal sense because all of her representations called for future performance. Had the plaintiffs not received a return of all the monies actually given to McGinty, the court would be more troubled with this result. Notwithstanding, as with any investment, there is no absolute guarantee that it will result in a profit to the investor. Certainly, no reasonable person could anticipate a rate of return such as that calculated by Stephen Lieb at 20% to 30% per annum compounded quarterly. The plaintiffs could have, and should have, better protected themselves. The court does not want to be overly critical, but the plaintiffs lost their anticipated profits, fortunately not their principal investments, when they became hooked on the lure of easy money.

The only debt that will be excepted from discharge in McGinty's bankruptcy case is the sum of $5,000.00, representing the value of the oriental rug, owned by LaChapelle, and wrongfully converted by McGinty.

An order will be entered consistent with this opinion.