IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
December 2, 2020 Session

## PRYORITY PARTNERSHIP v. AMT PROPERTIES, LLC, ET AL.

Appeal from the Circuit Court for Hamilton County
No. 17C1340        Kyle E. Hedrick, Judge

_____

### No. E2020-00511-COA-R3-CV

_____

In this action involving a commercial lease, the trial court granted judgment in favor of the lessee, determining that the lessor had materially breached the lease. The court further determined that the lessor was liable for negligent misrepresentation, due to its misrepresentations concerning the condition of the roof on the leased building and its intent to repair the roof, and constructive eviction, due to its failure to timely repair the building and render it tenantable. The court awarded compensatory damages to the lessee in the amount of $193,006.35 as well as attorney's fees in the amount of $69,002.68. The lessor has appealed. Discerning no reversible error, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court
Affirmed; Case Remanded**

THOMAS R. FRIERSON, II, J., delivered the opinion of the court, in which JOHN W. MCCLARTY and KRISTI M. DAVIS, JJ., joined.

Gary R. Patrick, Jeremy M. Cothern, and Allen Yates, Chattanooga, Tennessee, for the appellant, Pryority Partnership.

W. Gerald Tidwell, Jr., Chattanooga, Tennessee, for the appellees, AMT Properties, LLC, and David Crick.

## OPINION

### I. Factual and Procedural Background

On December 13, 2017, the lessor, Pryority Partnership ("Pryority"), filed a complaint in the Hamilton County Circuit Court ("trial court") against its lessee, AMT Properties, LLC, and the lessee's owner, David Crick (collectively, "AMT"). Pryority

asserted that the parties had executed a written lease agreement ("the Lease") on June 9, 2017, concerning a commercial warehouse ("the Warehouse") located in Chattanooga, Tennessee, and that Mr. Crick had personally guaranteed AMT's performance under the Lease.[1] According to Pryority, although the Lease provided that AMT would pay rent payments of $68,333.33 every four months, AMT had failed to make the required payment due on December 1, 2017. Pryority alleged that rent and late fees continued to accrue despite the fact that AMT had sent a letter on November 22, 2017, notifying Pryority that it was vacating the Warehouse. Pryority sought an award of unpaid rent, late charges, interest, and attorney's fees pursuant to the Lease.

AMT filed an answer and counter-complaint on January 29, 2018. AMT asserted that the Warehouse was untenantable due to holes in the roof and significant water incursion. According to AMT, it had intended to operate a factory/machine shop for the production of various items in the Warehouse but had been unable to complete the necessary electrical work to operate its machinery because of the water issues. AMT also claimed that Pryority had failed to repair the roof leaks despite knowledge of the problems. AMT denied that Pryority was entitled to any relief, asserting, *inter alia*, the defenses of impossibility of performance, equitable estoppel, and failure of consideration.

In its counter-complaint, AMT asserted that Pryority had marketed the Warehouse as ready to occupy at the time of the Lease's execution. AMT claimed that after it brought the roof issues to Pryority's attention, Pryority failed to repair or replace the roof despite having assured AMT that this would be accomplished. AMT further asserted that it tried for several months to occupy the Warehouse but was unable to do so due to the water-related problems. AMT asserted that as a result, although it had spent a total of $191,438.38 in rent, deposits, upgrades, and repairs to the Warehouse, it was forced to abandon the Warehouse and move its business elsewhere. AMT alleged that Pryority had breached the Lease's provisions regarding Pryority's duty to keep the building in good repair, negligently misrepresented the condition of the Warehouse, and engaged in deceptive practices pursuant to the Tennessee Consumer Protection Act ("TCPA"). AMT sought an award of compensatory damages, treble damages, attorney's fees, and costs.

On October 11, 2019, Pryority filed a motion for summary judgment accompanied by a statement of undisputed material facts and supporting documentation. In its statement of undisputed material facts, Pryority claimed that AMT possessed knowledge of the leaking roof when it executed the Lease. Pryority averred that it had attempted repair of the roof and was in the process of obtaining financing to replace the roof when AMT unilaterally decided to abandon the Warehouse and breach the Lease. According to Pryority, AMT leased the Warehouse in an "as is" condition. Pryority stated that AMT subsequently became impatient and vacated the building when the roof was not

---

[1] Although Pryority stated in its complaint that the lease was executed on July 12, 2012, a copy of the Lease entered as an exhibit at trial demonstrates that the actual date of execution was June 9, 2017.

immediately repaired without attempting to mitigate its damages. AMT filed a response in opposition to summary judgment, also with supporting documents.[2]

The trial court conducted a bench trial on December 10 and 11, 2019. Following the filing of proposed findings of fact and conclusions of law by the parties, the trial court entered a memorandum and order on March 2, 2020, in which the court made extensive factual findings. In its order, the trial court found that Pryority knew as early as October 2014 that the Warehouse roof's leaks were sufficiently severe so as to render the building untenantable for any lessee that needed to run electrical machinery. The court further found that by the time of the Lease's execution, Pryority also knew that the temporary repair patches it had attempted prior to that point had been insufficient to remedy the issue.

According to the trial court's findings, AMT approached Pryority with a request to lease the Warehouse in May 2017 because AMT needed a larger space within which to operate its business. When the parties executed the Lease on June 9, 2017, both parties knew that the roof leaked. When Mr. Crick expressed concerns about the roof, Pryority's representative assured Mr. Crick that the roof would be repaired and that the building would be tenantable for AMT's intended use as a machine shop. The court also found, however, that Pryority failed to disclose the severity or persistence of the leaks to AMT and that it continued thereafter to attempt the same unsuccessful repair methods.

As the trial court noted, the Lease contained a provision stating that Pryority was responsible for keeping the roof in good repair and for providing a building that was "structurally sound for the intended use of a machine shop." AMT had to invest significant funds to add wiring and perform electrical work required in order to operate its machinery. Moreover, AMT would have been required to spend approximately $100,000.00 to have its large and expensive pieces of machinery moved and installed. According to the court's findings, Pryority was struggling to determine whether to repair the roof or replace it and what the respective costs would be. In August 2017, Mr. Crick informed Pryority that he needed to know the plan for repairing the roof before he spent $100,000.00 to move and set up his equipment. AMT proceeded with its upgrades to the Warehouse in the meantime.

The trial court determined that Mr. Crick continued to request a plan through October 2017 but received no concrete response from Pryority. In its last communication to Mr. Crick on October 17, 2017, Pryority stated that it was trying to obtain financing to have the roof replaced and that such replacement should occur within the "next few

---

[2] Although the record does not contain an order disposing of Pryority's summary judgment motion, the trial court stated at the beginning of the trial that the motion was denied due to the existence of genuine issues of material fact.

months." The court also found that although Pryority had received repair quotes as early as June 2017, Pryority did not undertake to partially replace the roof until November 2017 after AMT had vacated the premises. According to the court's findings, Pryority was attempting to wait until AMT made its December 2017 rent payment to repair or replace the roof so that the rent payment would offset a portion of the attendant expense. The partial roof replacement ultimately cost Pryority $132,940.00, and the court noted that one of Pryority's agents had testified that Pryority did not need to obtain financing to pay that cost.

The trial court determined that the Warehouse was never rendered tenantable during the five months that it was in AMT's possession. The court further found that Pryority had never communicated a timeframe for the roof repair or replacement to AMT. Consequently, the court concluded that Pryority had materially breached the Lease. The court further determined that Mr. Crick was a highly credible witness and that if the roof had been properly repaired, AMT would have proceeded to set up its machine shop and continue operating under the Lease.

The trial court found that Pryority had not acted reasonably in scheduling the repairs and that there was no just reason for its delay. Relying on *Couch v. Hall*, 412 S.W.2d 635, 637 (Tenn. 1969), and *Hogan v. Coyne Int'l Enter. Corp.*, 996 S.W.2d 195 (Tenn. Ct. App. 1998), the court found that the Warehouse was untenantable and that AMT had been constructively evicted by reason of Pryority's failure to repair the roof. The court found that Pryority had materially breached the Lease and had misrepresented the condition of the Warehouse. Ruling that AMT should be placed in the same position as it would have been in had the breach not occurred, the court awarded to AMT $193,006.35 in compensatory damages for rent, repairs, and other expenses incurred. The court also ordered that the amount of an award of attorney's fees would be addressed at a later hearing.

Pryority timely filed a notice of appeal on March 27, 2020. It subsequently filed a motion, pursuant to Tennessee Rule of Civil Procedure 54, seeking alteration of the trial court's order. Pryority posited that the court had not expressly ruled on AMT's TCPA claim and requested that the court deny it. On May 18, 2020, the trial court entered an order specifically denying AMT's claim under the TCPA. The court also awarded to AMT attorney's fees and expenses, pursuant to the Lease's terms, in the amount of $69,002.68.

## II. Issues Presented

Pryority presents the following issues for this Court's review, which we have restated slightly:

1.    Whether the trial court erred by determining that Pryority had engaged in negligent misrepresentations.

2.    Whether the trial court erred by awarding to AMT a refund of its rent payments tendered during the time period when it occupied the Warehouse.

3.    Whether the trial court erred by determining that the Lease provided for an award of attorney's fees to AMT in this case.

## III. Standard of Review

Our review of the trial court's judgment following a non-jury trial is *de novo* upon the record with a presumption of correctness as to the trial court's findings of fact unless the preponderance of the evidence is otherwise. *See* Tenn. R. App. P. 13(d); *Rogers v. Louisville Land Co.*, 367 S.W.3d 196, 204 (Tenn. 2012). "In order for the evidence to preponderate against the trial court's findings of fact, the evidence must support another finding of fact with greater convincing effect." *Wood v. Starko*, 197 S.W.3d 255, 257 (Tenn. Ct. App. 2006) (citing *Rawlings v. John Hancock Mut. Life Ins. Co.*, 78 S.W.3d 291, 296 (Tenn. Ct. App. 2001)). We review questions of law, including questions involving contract interpretation, *de novo* with no presumption of correctness. *See Bowden v. Ward*, 27 S.W.3d 913, 916 (Tenn. 2000); *Cummings Inc. v. Dorgan*, 320 S.W.3d 316, 333 (Tenn. Ct. App. 2009). The trial court's determinations regarding witness credibility are entitled to great weight on appeal and shall not be disturbed absent clear and convincing evidence to the contrary. *See Morrison v. Allen*, 338 S.W.3d 417, 426 (Tenn. 2011); *Jones v. Garrett,* 92 S.W.3d 835, 838 (Tenn. 2002).

## IV. Negligent Misrepresentation

We note at the outset that on appeal, Pryority has not contested the trial court's determination that Pryority materially breached the Lease. Pryority, however, does contest the trial court's determination that it was liable for making negligent misrepresentations to AMT. With regard to a claim of negligent misrepresentation, this Court has previously explained:

> To succeed on a claim of negligent misrepresentation, a "plaintiff must establish that '(1) the defendant supplied information to the plaintiff; (2) the information was false; (3) the defendant did not exercise reasonable

care in obtaining or communicating the information; and (4) the plaintiff justifiably relied on the information.'" *Staggs v. Sells*, 86 S.W.3d 219, 223 (Tenn. Ct. App. 2001) (quoting *Atkins v. Kirkpatrick*, 823 S.W.2d 547, 552 (Tenn. Ct. App. 1991)). Furthermore, Tennessee courts require that the false information consists of statements of a material past or present fact. *McElroy v. Boise Cascade Corp.*, 632 S.W.2d 127, 130 (Tenn. Ct. App. 1982). Consequently, the tort of negligent misrepresentation cannot be based on statements of opinion or representations of future events. *Id.*

*Int'l Mkt. & Rest., Inc. v. Belmont Univ.*, No. M2010-00005-COA-R3-CV, 2010 WL 4514980, at *3 (Tenn. Ct. App. Nov. 9, 2010). *See Walker v. Sunrise Pontiac-GMC Truck, Inc.*, 249 S.W.3d 301, 311 (Tenn. 2008) (listing the same elements of a negligent misrepresentation claim as noted above).

The trial court, through its March 2, 2020 order, determined that the elements of negligent misrepresentation were established because Pryority had supplied false information concerning the state of the roof meant to "entice AMT to continue paying rent and occupy the Building." The court noted that the "number of repair calls should have told Pryority that the information being communicated was false." It is unclear whether the "information" to which the court referred was the severity of the leaks or Pryority's ability to repair them. In its appellate brief, AMT contends that Pryority made negligent misrepresentations concerning both Pryority's ability to quickly repair the roof and the severity of the existing leaks.

With regard to the severity of the roof leaks, the proof is clear that the roof had been leaking extensively for a number of years, as demonstrated by the testimony of attorney Richard Jahn. Mr. Jahn testified that he had served as bankruptcy trustee concerning a former tenant of the Warehouse who had filed a bankruptcy action in 2014. Mr. Jahn explained that he had spent time in the building in 2014 and observed significant roof leaks and water intrusion during his tenure as trustee. In support, Mr. Jahn presented pictures, taken in 2014, displaying the severity of the roof leaks. Mr. Jahn further testified that he made Pryority aware of the leaks at that time. Pryor Bacon, III, one of the partners of Pryority who testified as its representative, admitted that the roof had been leaking since 2014 and that numerous attempts to repair it had been made with varying degrees of success. According to the undisputed proof, the roof was still leaking significantly in 2017.

Mr. Crick acknowledged during his testimony that he was aware the roof had been leaking at the time he signed the Lease. According to Mr. Crick, although the weather was dry when he toured the Warehouse before entering into the Lease, visible evidence of roof leaks was still present, such as water stains, rust, and black mold. Mr. Crick related that Pryor Bacon, Jr., the other Pryority partner and the father of Pryor Bacon, III, had assured him that the roof leaks could be remedied by August 1, 2017. Mr. Crick also

maintained that he relied on this assurance when he entered into the Lease. Mr. Crick pointed out that he had made Pryority aware of his intended use for the Warehouse. Moreover, Pryor Bacon, III, acknowledged during his testimony that Pryority was aware at the time of the Lease's execution that AMT intended to use the Warehouse as a machine shop with electrical equipment. Mr. Crick also stated that he was unaware of the severity of the roof leaks at the time he executed the Lease. The trial court found Mr. Crick to be a highly credible witness.

As this Court has previously explained concerning a negligent misrepresentation:

> The misrepresentation must consist of a statement of a material past or present fact. Thus, statements of opinion or intention are not actionable. Likewise, puffing or other sales talk is generally not actionable. Similarly, conjecture or representations concerning future events are not actionable even though they may later prove to be false.

*McElroy v. Boise Cascade Corp.*, 632 S.W.2d 127, 130 (Tenn. Ct. App. 1982) (internal citations omitted). Pryority postulates that assurances made by Pryority's representatives concerning the timeliness and efficacy of future repairs, which ultimately proved to be false, would not necessarily constitute negligent misrepresentations because they were not statements of present fact.

As the trial court pointed out in its March 2020 order:

> Pryority did not disclose to AMT the severity or the persistence of the leaks over the 3 years that they had owned the property. [Pryority] was well aware that the roof not only leaked, but leaked severely, and that their temporary fixes from 2014 and 2015 were not working prior to entering into negotiations with AMT. Moreover, Pryority used the same patching approach in an attempt to make the property tenantable; the very same methods that had failed them for years. Nevertheless, [Mr. Bacon] gave [Mr. Crick] assurances that they could and would repair the leaks and make the Building tenantable as a machine shop.

In that order, the court ultimately held that "Pryority had to know when it rented the Building to AMT the roof needed to be replaced."

However, in its final order dated May 18, 2020,[3] which addressed the issues of attorney's fees and AMT's TCPA claim, the trial court found in pertinent part:

---

[3] *See Winter v. Smith*, 914 S.W.2d 527, 535 (Tenn. Ct. App. 1995) ("Without a Tenn. R. Civ. P. 54.02 certification of finality, an order adjudicating only part of the claims or defenses remains interlocutory and is subject to revision by the trial court any time prior to the entry of a final judgment adjudicating all

[AMT was] well aware that the roof leaked and, in fact, w[as] charged less money at the inception of the lease in order to allow both parties to perform work in preparation for use of the premises as a machine shop. Fixing leaks was a part of the early work to be performed by Pryority. It became clear early on that the spot fixes to the roof (as had been traditionally done by Pryority in the past) were an insufficient remedy and that the premises would not be habitable without the installation of a new roof. The Court finds that the owner was unaware of the absolute need for a new roof at the time of the signing of the lease Agreement. It was only after the early and multiple notifications by Crick that it was clear a new roof was needed.

Based on our review of the evidence, we agree with the trial court's ultimate findings. It is undisputed that AMT was aware that the roof leaked when it entered into the Lease. Although Pryority clearly had superior knowledge concerning the condition of the roof and the severity of the leaks, there was a dearth of evidence demonstrating that Pryority knew the roof could not be repaired at the time the Lease was signed. As such, Pryority's promises to repair the roof, as opposed to replacing it, did not constitute misrepresentations of a past or present fact.

We note, however, that Pryority failed to disclose to Mr. Crick that the building experienced significant water intrusion when it rained and that Pryority's attempts to patch the roof over a number of years had been numerous and largely unsuccessful. Instead, Pryority represented that the roof was capable of repair in short order. Moreover, although Pryority has attempted to rely on language contained in the body of the Lease providing that the Warehouse was accepted by AMT in its "existing condition," Exhibit A to the Lease expressly provides that the Warehouse "is structurally sound for the intended uses as a machine shop" and that the covenants contained in Exhibit A would "supersede any previous statements in the lease."

As the trial court noted, it should have been obvious to Pryority at the time the Lease was executed that the roof could not be quickly repaired so as to render the Warehouse tenantable, especially for the use intended by AMT. Based on these facts, the trial court properly determined that Pryority engaged in negligent misrepresentation concerning the state of the Warehouse's roof at the time the Lease was executed. Pryority maintained superior knowledge of the roof's condition and the numerous failed repair attempts through the years, which constituted past and present facts. Mr. Crick relied on Pryority's misrepresentation to his detriment by moving forward with the Lease and AMT's expenditure of funds toward renting and renovating the Warehouse with the intent of operating its machine shop therein.

---

the claims raised.").

- 8 -

Pryority contends that Mr. Crick's reliance was unreasonable and that he should have had the Warehouse's roof independently inspected to determine the severity of the leaks. This contention sounds in principles of comparative fault, a defense generally applicable to claims of negligent misrepresentation. *See Staggs v. Sells*, 86 S.W.3d 219, 224 (Tenn. Ct. App. 2001). However, because Pryority did not plead the defense of comparative fault in response to AMT's answer and counter-complaint, the defense was not considered by the trial court and cannot be considered by this Court. *See* Tenn. R. Civ. P. 8.03 ("In pleading to a preceding pleading, a party shall set forth affirmatively facts in short and plain terms relied upon to constitute . . . comparative fault."); *see also Barnes v. Barnes*, 193 S.W.3d 495, 501 (Tenn. 2006) ("Issues not raised in the trial court cannot be raised for the first time on appeal."). We accordingly affirm the trial court's determination that Pryority was liable for its negligent misrepresentation.

## V. Award of Damages

In its brief on appeal, Pryority states that although it disagrees with the trial court's imposition of liability based on constructive eviction and breach of contract, it has chosen to focus solely on the trial court's damage award. Pryority accordingly posits that the trial court erred by awarding to AMT a refund of its rent payments made during the time period when it occupied the Warehouse. Pryority argues that the proper remedy for constructive eviction is relief from the obligation to pay rent following the tenant's abandonment of the leased property. *See, e.g., Morrison v. Smith*, 757 S.W.2d 678, 682 (Tenn. Ct. App. 1988) (explaining that damages for constructive eviction accrue only after abandonment). AMT maintains that the damages awarded were proper based on Pryority's breach of the Lease. We agree with AMT.

The trial court determined that Pryority materially breached the provisions of the Lease, and Pryority has not disputed this determination on appeal. As this Court has previously explained concerning breach of a lease agreement:

> It is well settled that the measure and elements of damages upon the breach of a lease is governed by the general principles which determine the measure of damages on claims arising from breaches of other kinds of contracts. The general rule of contracts, to the effect that the plaintiff may recover damages only to the extent of its injury, applies to leases. <u>Damages for breach of a lease should, as a general rule, reflect a compensation reasonably determined to place the injured party in the same position as he would have been in had the breach not occurred and the contract been fully performed</u>, taking into account, however, the duty to mitigate damages. In addition, damages resulting from a breach of a lease must have been within a contemplation of the parties; must have been proximately caused by the breach; and must be ascertainable with reasonable certainty without resort

to speculation in conjecture.  *See* 49 Am. Jur. 2d *Landlord & Tenant* § 96 (2003).

A tenant harmed by a landlord's breach of a commercial lease is entitled to recover all damages it has sustained as a proximate result, so long as such damages are reasonably shown and are capable of reasonably accurate measure.  *Ferrell v. Elrod*, 469 S.W.2d 678, 689 (Tenn. Ct. App. 1971).  These damages may include one or more of the following items as may be appropriate so long as no double recovery is involved:

> (1)   [I]f the tenant is entitled to terminate the lease and does so, the fair market value of the lease on the date he terminates the lease;
>
> (2)   the loss sustained by the tenant due to reasonable expenditures made by the tenant before the landlord's default which the landlord at the time the lease was made could reasonably have foreseen would be made by tenant;
>
> (3)   if the tenant is entitled to terminate the lease and does so, reasonable relocation costs;
>
> * * *
>
> (5)   if the use of the leased property contemplated by the parties is for business purposes, loss of anticipated business profits proven to a reasonable degree of certainty, which resulted from the landlord's default, and which the landlord at the time the lease was made could reasonably have foreseen would be cause[d] by the default;
>
> (6)   if the tenant eliminates the default, the reasonable costs incurred by the tenant in eliminating the default; and
>
> (7)    interest on the amount recovered at the legal rate for the period appropriate under the circumstances.

Restatement (Second) of Property: Landlord & Tenant § 10.2 (1977).

*Hardison Law Firm, P.C. v. Howell*, No. W2002-01945-COA-R3-CV, 2003 WL 22718427, at *17-18 (Tenn. Ct. App. Nov. 17, 2003) (emphasis added).

In the case at bar, Mr. Crick testified that AMT desired to move its machine shop into a larger facility because its business was growing and that AMT anticipated purchasing additional machinery in order to increase production and accommodate demand. AMT was also expanding the scope of its business to include the production of hydroelectric components, which required the purchase of different and larger machines. As Mr. Crick explained, AMT employed computerized, numerically controlled ("CNC") machines in its operations, the value of which ranged from $100,000.00 to $500,000.00 each. According to Mr. Crick, the CNC machines each weighed between ten and twenty tons and were extremely difficult to move. Once in place, operational CNC machines would have required AMT to install a specialized electrical system in the Warehouse at a cost of approximately $75,000.00. In addition, AMT would have been required to employ trained equipment movers to transport, level, and recalibrate the CNC machines when they were relocated to the Warehouse at a combined cost of approximately $100,000.00.

Mr. Crick testified that he spoke to both Pryor Bacon, Jr., and Pryor Bacon, III, concerning AMT's intended use for the Warehouse before the Lease was signed. Following execution of the lease, Mr. Crick became aware of a major roof leak directly above the Warehouse's main electrical panel in addition to numerous other leaks. Each time it rained, water would pour onto the panel, tripping the breaker. According to Mr. Crick, this leak was never fixed during AMT's tenancy.

Mr. Crick further related that AMT had completed all of its repairs required under the Lease by the end of July. At that time, he sent an email to Pryor Bacon, Jr., stating that he believed the roof would need to be replaced because Pryority's repair attempts had been unsuccessful. Mr. Crick explained that Mr. Bacon had mentioned that roof replacement might involve removing the existing roof, which would render the interior of the Warehouse completely exposed to the elements. For this reason, Mr. Crick decided to delay moving additional equipment into the Warehouse while asking Pryority for a definite timeframe within which the roof would be fixed. Mr. Crick had multiple conversations with Pryor Bacon, Jr., about the roof and the need for a dry building before AMT could proceed with setting up operations in the Warehouse. According to Mr. Crick, relocating and installing the CNC machines was a lengthy process, such that it would require approximately four months to become operational from the date AMT began to move its machinery.

Mr. Crick explained that although he repeatedly asked Pryority to provide a plan for rendering the Warehouse tenantable, he was never provided a definite date by which the building would be dry. Meanwhile, the Warehouse roof leaks continued to worsen with new leaks developing as time passed. Mr. Crick related that his last correspondence from Pryor Bacon, III, indicated that Pryority would need to refinance the Warehouse indebtedness in order to pay for a new roof, which process could be completed within a

"few months." Mr. Crick believed that AMT could not safely operate the CNC machines in a wet environment without causing damage to the machines or injury to employees. For this reason, Mr. Crick made the decision in November 2017 to vacate the building and cease paying rent. Mr. Crick explained that due to AMT's inability to occupy the Warehouse for production purposes, AMT was forced to abandon bidding on several large contracts worth millions of dollars in revenue for AMT.

Mr. Crick testified that AMT ultimately expended $193,006.35 in rent, moving expenses, renovation expenses, and other costs related to AMT's failed attempt to relocate to the Warehouse. Mr. Crick did not seek damages for lost revenue or profits. The trial court awarded AMT the full amount of damages sought.

Based on our thorough review of the evidence, we determine that the trial court's award of damages to AMT was proper. Although AMT paid rent to occupy the Warehouse and was able to take possession thereof, the Warehouse was never made tenantable by Pryority. The Lease specifically provided that Pryority was obligated to keep the roof in "good repair," and Pryor Bacon, III, acknowledged during his testimony that this obligation would have included providing a roof that would have kept water out of the building. Despite the Lease requirements, the proof demonstrated that the roof leaked severely during AMT's entire tenancy such that AMT was never able to utilize the building for its intended purpose as a machine shop. As such, Pryority breached its obligation under the Lease to keep the Warehouse's roof in good repair. AMT was entitled to damages proximately caused by that breach, and the damages it claimed were "reasonably shown and [] capable of reasonably accurate measure." *See Hardison Law Firm*, 2003 WL 22718427, at *17.

AMT expended large sums of money renovating a building that it was ultimately forced to abandon. AMT also paid rent and other expenses for the Warehouse that it was unable to fully occupy for its intended purpose. In addition, AMT's inability to fully occupy the Warehouse meant that AMT was constrained to continue utilizing its previously existing business location for production because it was never able to remove all of its equipment from that location. Furthermore, AMT was unable to commence production in the larger Warehouse building and was hindered from obtaining various contracts because it could not set up its machine shop in the larger facility.

We determine that AMT's damages claimed were "within a contemplation of the parties," "proximately caused by the breach," and "ascertainable with reasonable certainty without resort to speculation." *See Hardison Law Firm*, 2003 WL 22718427, at *17. We further determine that the only way the trial court could "place [AMT] in the same position as [it] would have been in had the breach not occurred and the contract been fully performed," *see id.*, would be to award AMT the rent and other expenses it incurred in attempting to move its business to a building that was never made tenantable by the landlord. We therefore affirm the trial court's award of damages to AMT.

- 12 -

## VI. Award of Attorney's Fees

Finally, Pryority asserts that the Lease does not provide for AMT to receive an award of attorney's fees because the Lease provision at issue (1) does not expressly apply to attorney's fees and (2) does not apply except when a party is seeking to "enforce" the terms of the Lease. Section twenty-eight of the Lease contains the heading, "Legal Fees and Expenses," and provides as follows:

> If it shall be necessary for either part[y] hereto to hire and/or obtain Legal counsel, pursue any remedy, or incur any other expense in order to force the other to comply with and/or perform any of the provisions, conditions, and covenants of this Lease, then the prevailing party shall be reimbursed by the other for the entire reasonable customary cost thereof such obligation being deemed to have accrued from the date of the commencement of any action and to be enforceable whether or not the action is prosecuted to judgment.

In asserting that this provision does not require an award of attorney's fees to the prevailing party, Pryority urges that the heading should be disregarded and that the contract provision must specifically and expressly state that attorney's fees will be awarded, citing *Cracker Barrel Old Country Store, Inc. v. Epperson*, 284 S.W.3d 303, 309 (Tenn. 2009). Because the Lease is a contract, we will apply customary rules of contract construction to determine the meaning of this provision.

Concerning proper interpretation of a contract such as the Lease herein, our Supreme Court has previously explained:

> In "resolving disputes concerning contract interpretation, our task is to ascertain the intention of the parties based upon the usual, natural, and ordinary meaning of the contractual language." *Guiliano v. Cleo, Inc.*, 995 S.W.2d 88, 95 (Tenn. 1999). This determination of the intention of the parties is generally treated as a question of law because the words of the contract are definite and undisputed, and in deciding the legal effect of the words, there is no genuine factual issue left for a jury to decide. 5 Joseph M. Perillo, *Corbin on Contracts*, § 24.30 (rev. ed. 1998); *Doe v. HCA Health Services of Tenn., Inc.*, 46 S.W.3d 191, 196 (Tenn. 2001).

> A court's initial task in construing a contract is to determine whether the language of the contract is ambiguous. Once found to be ambiguous, a court applies established rules of construction to determine the parties' intent. "Only if ambiguity remains after the court applies the pertinent rules of construction does [the legal meaning of the contract] become a

question of fact" appropriate for a jury. *Smith v. Seaboard Coast Line R.R. Co.*, 639 F.2d 1235, 1239 (5th Cir. 1981). . . .

The central tenet of contract construction is that the intent of the contracting parties at the time of executing the agreement should govern. *Empress Health & Beauty Spa, Inc. v. Turner*, 503 S.W.2d 188, 190 (Tenn. 1973). The intent of the parties is presumed to be that specifically expressed in the body of the contract. "In other words, the object to be attained in construing a contract is to ascertain the meaning and intent of the parties as expressed in the language used and to give effect to such intent if it does not conflict with any rule of law, good morals, or public policy." 17 Am. Jur. 2d, *Contracts*, § 245, quoted in *Turner*, 503 S.W.2d at 190. If clear and unambiguous, the literal meaning of the language controls the outcome of contract disputes.

Nonetheless, a contractual provision may be susceptible to more than one reasonable interpretation, which renders the terms of the contract ambiguous. *Memphis Housing Auth. v. Thompson*, 38 S.W.3d 504, 512 (Tenn. 2001), *cert. denied*, 534 U.S. 823, 122 S. Ct. 59, 151 L. Ed. 2d 27 (2001). "A contract is ambiguous only when it is of uncertain meaning and may fairly be understood in more ways than one." *Turner*, 503 S.W.2d at 190-91. Where the terms of the contract are ambiguous, the intention of the parties cannot be determined by a literal interpretation of the language, and the courts must resort to other rules of construction.

*Planters Gin Co. v. Fed. Compress & Warehouse Co.*, 78 S.W.3d 885, 889-90 (Tenn. 2002).

Our Supreme Court has further explained: "An ambiguous provision in a contract generally will be construed against the party drafting it." *Allstate Ins. Co. v. Watson*, 195 S.W.3d 609, 612 (Tenn. 2006). Moreover, "when a contractual provision is ambiguous, a court is permitted to use parol evidence, including the contracting parties' conduct and statements regarding the disputed provision, to guide the court in construing and enforcing the contract." *Id*.

On appeal, Pryority postulates that the contractual provision quoted above simply allows for the "costs" of litigation, rather than attorney's fees, to be awarded to a prevailing party. Conversely, AMT asserts that the provision's language concerning the "reimbursement" of the "entire reasonable customary cost" clearly refers to, *inter alia*, "hir[ing] and/or obtain[ing] Legal counsel." Because the language in dispute is capable of more than one reasonable interpretation, we determine that the language is ambiguous

such that we may properly consider parol evidence when interpreting it.[4] *See Planter's Gin Co.*, 78 S.W.3d at 889-90; *Allstate*, 195 S.W.3d at 612.

In its original complaint, Pryority claimed that it was entitled to recover its attorney's fees and expenses from AMT pursuant to the Lease. Pryority repeated this claim in its motion for summary judgment and through its proposed findings of fact and conclusions of law. Therefore, Pryority's conduct concerning the disputed provision supports AMT's interpretation of the provision. *See Allstate*, 195 S.W.3d at 612. Moreover, we note that the provision should be construed against Pryority as drafter of the Lease. *See id.*

Concerning Pryority's argument based specifically on the Supreme Court's ruling in *Cracker Barrel*, 284 S.W.3d at 309, we note that the language utilized in the above-referenced Lease provision is more specific than that incorporated in the *Cracker Barrel* contract. In this case, the Lease provides for reimbursement of "reasonable customary cost[s]" when a party finds it necessary to "hire and/or obtain Legal counsel, pursue any remedy, or incur any other expense in order to force the other to comply with and/or perform any of the provisions, conditions, and covenants of this Lease." By contrast, in *Cracker Barrel*, the contract simply provided that upon a violation of the contract, a party could seek legal and equitable remedies and "[a]ll costs and expenses of any suit or proceeding shall be assessed against the defaulting party." *Id.* at 307. The Supreme Court determined that this language was insufficient to allow for an award of attorney's fees, explaining that the terms, "costs" and "expenses," without more, would not typically encompass an award of attorney's fees. *Id.* at 309.

The Supreme Court further elucidated that "if the parties intend to create contractually a right to recover attorney fees, the contractual language must specifically and expressly articulate this intent and not merely provide for recovery of 'costs and expenses.'" *Id.* at 310-11. As previously explained, in this matter the Lease provides in pertinent part:

> If it shall be necessary for either part[y] hereto to hire and/or obtain Legal counsel, pursue any remedy, or incur any other expense in order to force the other to comply with and/or perform any of the provisions, conditions, and covenants of this Lease, then the prevailing party shall be reimbursed by the other for the entire reasonable customary cost thereof . . . .

---

[4] Although the trial court did not explicitly find the provision at issue to be ambiguous, it did consider Pryority's conduct in relying on this provision to seek an award of attorney's fees if it was determined to be the prevailing party in the litigation.

Reviewing this provision in its entirety, we conclude that the reference to hiring counsel "or incur[ring] any other expense," in combination with the language providing for reimbursement of "reasonable customary cost[s]" related thereto, demonstrates that such costs would include attorney's fees. *See, e.g., Raines Bros., Inc. v. Chitwood*, No. E2013-02232-COA-R3-CV, 2014 WL 3029274, at *12 (Tenn. Ct. App. July 3, 2014) (determining that attorney's fees could be awarded when the parties' agreement provided "that if a dispute between the parties results in litigation, the prevailing party is entitled to recover 'reasonable costs, expenses, and fees incurred.'"). When coupled with Pryority's conduct of repeatedly seeking attorney's fees in this litigation pursuant to the same provision it now challenges, we determine that the parties intended for the provision at issue to include recovery of reasonable attorney's fees.

As further support for this interpretation, we note that the provision's heading, "Legal <u>Fees</u> and Expenses," also suggests that attorney's fees should be included therein (emphasis added). Pryority argues that the heading should not be considered when analyzing the contract's provisions. We note, however, that this Court has previously considered headings or titles within contracts in its analysis of contract language when the contract did not specifically exclude such headings as part of the contract. *See Advanced Banking Servs., Inc. v. Zones, Inc.*, No. E2017-02095-COA-R3-CV, 2018 WL 4775642, at *5 (Tenn. Ct. App. Oct. 3, 2018) ("We are not persuaded by [the defendant's] argument that the sentence contained in this section should be read without consideration of the section title or the paragraph headings that give context to its meaning."); *Nyrstar Tenn. Mines-Strawberry Plains, LLC v. Claiborne Hauling, LLC*, No. E2017-00155-COA-R3-CV, 2017 WL 5901017, at *3 (Tenn. Ct. App. Nov. 29, 2017) (noting that "the title of the provision at issue provide[d] further support" for the Court's analysis of the contract language).

Pryority further argues that the trial court erred by allowing AMT to recover its attorney's fees when AMT had not taken action to "to force [Pryority] to comply with and/or perform any of the provisions, conditions, and covenants of this Lease," as stated in the Lease's fee-shifting provision. Instead, as Pryority contends, AMT was primarily defending against Pryority's action seeking payment of rent owed pursuant to the Lease, although AMT did file a counterclaim seeking damages for, *inter alia*, breach of the Lease. A similar argument was rejected by this Court in *Parker v. Brunswick Forest Homeowners Ass'n, Inc.*, No. W2018-01760-COA-R3-CV, 2019 WL 2482351, at *8 (Tenn. Ct. App. June 13, 2019), *perm. app. denied* (Tenn. Sept. 18, 2019).

In *Parker*, a homeowner sued his homeowner's association, which had placed a lien on title to the homeowner's real property due to unpaid assessments. *See id*. In response, the association not only defended against the homeowner's action but also filed a counterclaim for breach of contract based on the unpaid assessments. *Id*. The association prevailed on its breach of contract claim while the homeowner's claims were dismissed. *Id*.

The association in *Parker* sought an award of attorney's fees based on a provision contained in the neighborhood's restrictive covenants, which stated in pertinent part:

> The Association may bring an action at law against the Member personally obligated to pay [an assessment], or foreclose the lien against the Lot or Lots subject to prior mortgages or Deeds of Trust upon the Lot or Lots, then belonging to said Member; in either of which events, the Association may collect from the said Member interest, costs and reasonable attorneys' fees.

*Parker*, 2019 WL 2482351, at *6. The homeowner argued that the association could only recover those fees incurred in enforcing the assessment/lien and could not recover its fees incurred in defending against the homeowner's action based on the language quoted above. *See id.*

> Following its analysis of applicable case law, the *Parker* Court determined:

> [I]n the absence of an express provision authorizing attorney's fees for the defense of an action, the defendant cannot recover attorney's fees where the defendant: (1) did not assert a claim for affirmative relief, such as a breach of contract action, against the plaintiff; (2) did not prevail in showing that the plaintiff breached some duty to the defendant; and (3) sought attorney's fees related to a wholly separate action unrelated to the present enforcement proceeding.

2019 WL 2482351, at *8. In *Parker*, the association had asserted a claim for affirmative relief, had prevailed in showing that the homeowner had breached a duty to the association, and had sought fees related to the enforcement proceeding. *See id.* at 11. The *Parker* Court concluded that "all actions taken in this particular case, including the action of defending against Homeowner's complaint, fall within the ambit of the [restriction's] attorney's fee provision," explaining:

> [I]t was necessary for the Association to respond to Homeowner's claim in order to obtain relief on its counterclaim to collect on the assessments; stated differently, had Homeowner succeeded in showing that the assessments were in some way invalid, the Association would likely not have prevailed on its claim to collect the unpaid assessments. The same is true regardless of which party actually filed suit first. To hold otherwise would be to exalt form over function and reward parties for winning the race to the courthouse in violation of Tennessee's long-settled public policy.

- 17 -

*Id*.  The *Parker* Court accordingly ruled that the trial court properly awarded the association its fees incurred in both defending the homeowner's action and enforcing the restrictions.  *See id*.

Similarly, here, Pryority filed its action seeking to enforce the terms of the Lease, and AMT counterclaimed with, *inter alia*, a breach of contract action.  The trial court determined that Pryority had materially breached the Lease, a ruling that Pryority has not appealed.  As such, AMT asserted a claim for affirmative relief and prevailed in showing that Pryority had breached its duties to AMT while the fees sought were related to the litigation concerning the Lease's terms.  *See, e.g., Parker*, 2019 WL 2482351, at *11.  We therefore affirm the trial court's decision to award attorney's fees to AMT in this action concerning both its breach of contract claim and its defense against Pryority's claims.[5]

## VII.  Conclusion

For the foregoing reasons, we affirm the judgment of the trial court in its entirety.  We remand this matter to the trial court for enforcement of the judgment and collection of costs assessed below.  Costs on appeal are taxed to the appellant, Pryority Partnership.

_____
THOMAS R. FRIERSON, II, JUDGE

---

[5] In the argument section of AMT's initial brief, AMT argues that it is also entitled to an award of attorney's fees on appeal.  However, inasmuch as AMT failed to raise this as an issue in its statement of issues, we determine any issue concerning attorney's fees on appeal to be waived.  *See Gibson v. Bikas*, 556 S.W.3d 796, 810 (Tenn. Ct. App. 2018) (explaining that a party's request for attorney's fees on appeal would not be considered because it had not been raised as an issue in the statement of the issues); (*Ethridge v. Estate of Ethridge*, 427 S.W.3d 389, 395 (Tenn. Ct. App. 2013) ("Issues not raised in the statement of the issues may be considered waived.").